OPINION OF THE COURT
Memorandum.
The order of the Appellate Division should be affirmed.
Defendant argues that he was subjected to a custodial interrogation and that due to the failure to administer Miranda warnings (Miranda v Arizona, 384 US 436), all statements made by him should be suppressed. The issue of whether a suspect is in custody is generally a question of fact *838 (see, People v Morales, 65 NY2d 997, 998). The Appellate Division has left undisturbed Supreme Court’s determination that there was no custodial interrogation, thus this court could overturn that finding only if we were to conclude, as a matter of law, that the proof was insufficient to establish that the interrogation was noncustodial (People v Williamson, 51 NY2d 801, 802). The Appellate Division correctly applied the standard established in People v Yukl (25 NY2d 585, 589) and concluded that a reasonable person, innocent of any crime would not have believed he was in custody under the circumstances. It based its conclusion on evidence in the record that (1) defendant appeared at the precinct voluntarily and presented himself to the police as a friend of Ivory eager to assist in investigating his death, (2) the atmosphere at the precinct was not coercive, (3) the questioning was investigative, not accusatory, (4) the police did not treat defendant as if he were in custody but rather informed him expressly that he was not a suspect, (5) defendant was never handcuffed or physically restrained, (6) the questioning was not continuous but was interrupted frequently, (7) defendant never protested the questioning, (8) defendant was fed and allowed to relax in the station house by watching a baseball game, (9) the police advised defendant that he was not required to take a polygraph test, (10) defendant was asked, not ordered, to return to the precinct after his first polygraph, (11) defendant was allowed to sleep alone in an unlocked room in the station house, and (12) defendant was permitted to go unescorted into a store the following morning. Taken together, these facts are sufficient to establish that the interrogation was noncustodial.
At a minimum, this case is one in which " 'reasonable minds may differ as to the inference[s] to be drawn’ ” from the facts and is therefore beyond the review powers of this court (see, People v Harrison, 57 NY2d 470, 477; People v McRay, 51 NY2d 594, 601).
Titone, J.
(dissenting). I would reverse the Appellate Division order affirming defendant’s conviction and, after suppressing his station house statements, order a new trial. The only issue in this appeal is whether defendant was in custody at the time he made the inculpatory statements. Since the question of custody is ordinarily deemed a factual one, our only task is to determine whether the undisturbed findings and inferences of the courts below were based on the correct legal standard and are supported by the record (see, People v *839 Williamson, 51 NY2d 801). It is on this point that the majority and I differ.
As the majority notes, the courts below correctly invoked the standard dictated by People v Yukl (25 NY2d 585), in which it was held that the determination of custody is to be made from the viewpoint of a reasonable person in the defendant’s position. However, the conclusion those courts reached —that defendant was not in custody at the time he made his statements — seems to me to be beyond all reason and common sense on these facts.*
While defendant may have initially appeared at the police station voluntarily and was not treated as a suspect at the outset, the events that occurred over the ensuing 28 hours clearly transformed the encounter into a custodial one. By the time he blurted out his first admission, defendant had "failed” two separate lie detector tests concerning the homicide and had had two separate "stories” he told police about other possible perpetrators exposed as lies. Although he was not physically restrained with handcuffs, defendant was constantly and continuously in the presence of the police and, after he "failed” the first lie detector test, was even escorted by a police officer to the bathroom. Furthermore, when he was forced into admitting that his second "story” was a hoax and he informed the police that he no longer wished to cooperate, he was not told that he was free to leave or otherwise offered the opportunity to opt out of the questioning. To the contrary, he was asked to take a second lie detector test and to stay overnight at the precinct, where he slept on a bench in an unlocked room.
That he was "asked” rather than "ordered” to remain cannot sensibly be relied upon, since the characterization is largely a matter of semantics and, in any event, for most citizens a police officer’s "request” has virtually the same coercive force as a "demand.” Similarly, inasmuch as he was in the midst of a busy, and presumably fully staffed, police station, the fact that defendant was permitted to sleep in an unlocked room could hardly be considered as a factor diminishing the custodial atmosphere of his overnight stay. The additional fact that defendant was reasonably well treated in the sense that he was fed, not browbeaten and permitted to watch television during the extended breaks in the question *840 ing is not persuasive in this context, where the issue is not whether defendant’s statement was the product of coercion but rather whether a reasonable person in defendant’s position would have believed himself free to leave (see, People v Yukl, supra). Finally, although defendant was permitted to go into a candy and cigarette store by himself the next morning, it cannot be inferred from this circumstance that he felt free to come and go as he pleased, since at all times there were police officers waiting for him immediately outside the store and one of the waiting officers went inside himself before defendant had an opportunity to come back out onto the street. In sum, when some 28 hours after he first arrived at the police station defendant was confronted with his second lie detector test "failure,” no sensible person in his shoes could rationally have believed that he could simply have thanked the police for their trouble and walked away. Accordingly, I conclude that, as a matter of law, the record does not support the inference that defendant was not in custody when he made his first inculpatory remarks without benefit of Miranda warnings.
In closing, I would note that my concern, and my primary motivation for writing an extended dissenting opinion in this fact-based case, extends beyond the immediate consequences of the majority’s decision in relation to this defendant. My underlying concern is for the degree to which the "mixed question” doctrine may have impaired our ability as a court of last resort to supervise the lower courts’ enforcement of well-settled constitutional principles. I have no quarrel, in principle, with the "mixed question” doctrine as it has evolved and been applied in People v Harrison (57 NY2d 470, 477) and dozens of other recent cases. This rule, which is fundamentally one of judicial economy, serves the important purpose of insulating this court from a host of essentially fact-specific matters, thereby preserving its resources for the resolution of broader legal questions of State-wide significance. However, as the doctrine has been applied by the majority in this case, it may also serve to send a message that the findings and conclusions of the lower courts on these "mixed” issues are completely insulated from further review, no matter how improbable or contrary to common sense and experience they might be.
In the past, the court has counteracted that potential message by invoking its power to reject the lower courts’ "findings” on "mixed questions” in a limited number of selected *841 cases in which the "findings” below strained credulity and the undisputed record facts supported "no other inference” than one of official misconduct (compare, People v Ferro, 63 NY2d 316, 321, n 2, with People v Bryant, 59 NY2d 786). Such holdings, although rare, are nonetheless salutary, since they increase the public’s confidence in the court’s commitment to the enforcement of the constitutional rights it posits. In light of its egregious undisputed facts, this case presents the court with a similar opportunity.
Accordingly, rather than assuming that we are constrained under the "mixed question” doctrine by the lower courts’ "findings”, I would grasp the opportunity that this case presents to reiterate that the "mixed question” doctrine does not require us to accept labels and ultimate findings that do not, in our own common experience, fit the facts; rather, we are still bound to examine the conclusions of the lower courts from a realistic viewpoint and to overturn those conclusions when they rest on inferences that go beyond the borders of ordinary common sense. Since this is such a case, I must, respectfully, dissent from the court’s decision to affirm the suppression ruling challenged here.
Chief Judge Wachtler and Judges Simons, Kaye and Bellacosa concur; Judge Titone dissents and votes to reverse in an opinion in which Judges Alexander and Hancock, Jr., concur.
Order affirmed in a memorandum.

 Most of the significant facts are set forth in the majority and dissenting opinions at the Appellate Division (153 AD2d 494).