83 N.Y.2d 51 (1993)
629 N.E.2d 371
607 N.Y.S.2d 899
The People of the State of New York, Respondent,
v.
Yusef Salaam, Appellant.
Court of Appeals of the State of New York.
Argued November 9, 1993.
Decided December 16, 1993.
William M. Kunstler, New York City, and Ronald L. Kuby for appellant.
Robert M. Morgenthau, District Attorney of New York County, New York City (Donna Krone and Mark Dwyer of counsel), for respondent.
Chief Judge KAYE and Judges SIMONS, HANCOCK, JR., and LEVINE concur with Judge BELLACOSA; Judge TITONE dissents in a separate opinion; Judge SMITH taking no part.
*53 BELLACOSA, J.
A large group of youths participated in a series of violent felony assaults on the night of April 19, 1989 in Central Park. Defendant was prosecuted and convicted after a jury trial for rape and robbery in the first degree, and other crimes, in connection with the most serious crimes which were inflicted on a victim, identified only as "the Central Park jogger". He was sentenced as a juvenile offender. The Appellate Division affirmed his conviction (187 AD2d 363). Defendant appeals by leave of a Judge of this Court, and we affirm the order upholding the conviction.
Defendant asserts that his inculpatory statements concerning his participation, made to investigating police officers at the Manhattan precinct house the night following the crime spree, should have been suppressed. Defendant's argument rests principally on alleged police misconduct in isolating him, during the questioning, from his mother and other "supportive adults"  an aunt and his "Big Brother"  who attempted to see him at the station house.
*54 Defendant was 15 years of age when he committed the crimes at issue and when he was questioned. Evidence in the record supports the findings of the trial court at the suppression stage, which were explicitly analyzed and accepted by the Appellate Division in its unanimous affirmance of the conviction. Defendant deceived the police by asserting that he was 16 years of age and using false identification to buttress that assertion. There is no evidence that the police employed deception or trickery of the kind found objectionable by this Court, because of a design to unlawfully isolate a defendant during questioning (see, People v Townsend, 33 N.Y.2d 37). The officers here made known to defendant's family precisely where they were taking defendant, a fact unassailably confirmed by the appearance of family members at that designated precinct. Nor did defendant, after being advised of his rights, or anyone on his behalf request assistance of counsel (see, People v Bevilacqua, 45 N.Y.2d 508). Notably, all police questioning ceased when the fact of defendant's true age, 15, finally emerged from his mother and was verified.

I.
On the evening of April 19, 1989, a group of approximately 30 youths assaulted nine persons in Central Park. The most vicious crimes were committed against a 30-year-old woman, "the Central Park jogger". As she was jogging in the northern part of Central Park, she was grabbed by one of the youths and knocked to the ground. The evidentiary descriptions of the attack and the findings by the trial court are graphic and sufficiently well known as to require no recounting here. Only the prosecution of defendant for the crimes he committed against "the Central Park jogger" is at issue on this appeal.
On the night of the criminal incidents, the police captured several youths who implicated defendant and described him as being 16 or 17 years old. The next night, April 20, at about 10:30 P.M., the police went to defendant's apartment to follow up their investigation. In response to an officer's question, the defendant also stated that he was 16 years of age and produced a school transit pass that presented him as 16. This assertion was not contradicted by his sister, brother or friends, all of whom were present at the time.
The officers informed defendant's sister of the number and location of their precinct and requested that defendant accompany them there. He complied. At the station house, after *55 again producing his transit pass which stated he was 16, defendant was given complete Miranda warnings. Defendant invoked none of the recited protections and chose instead to give a detailed statement implicating himself in two of the attacks under investigation, including specifically the attack on "the Central Park jogger". While defendant was being questioned, his aunt and "Big Brother", an Assistant United States Attorney, arrived at the precinct. Their requests to see defendant were denied on the grounds that neither was a "parent or guardian" and the "Big Brother," by his own account, was not present in any professional representative capacity.
Defendant's mother arrived at the station house some time after midnight. She, too, was initially denied access to her son. However, when she informed the detectives that defendant was actually only 15 years of age, the officers went to the interview room, rechecked defendant's transit pass and asked him how old he was. For the first time, defendant corrected his earlier misrepresentations and said he was 15. From that point, as the Appellate Division stated, the police "scrupulously honored the request of his mother that questioning cease" (187 AD2d 363, 364, supra). Defendant then was permitted to meet with his mother.

II.
Defendant's argument for suppression of his inculpatory statements made prior to his being allowed to meet with his mother, on the ground that he was unlawfully isolated from those "supportive adults" who attempted to see him, finds no support in the record evidence under any cognizable legal theory that would afford him that relief. A showing that the isolation resulted from official deception or trickery is required before suppression becomes available under this theory (People v Townsend, 33 N.Y.2d 37, supra). In Townsend, this Court stated, "it is impermissible for the police to use a confession, even if it be otherwise voluntary, obtained from a 17-year-old defendant when, in the course of extracting such confession, they have sealed off the most likely avenue by which the assistance of counsel may reach him by means of deception and trickery" (id., at 41 [emphasis added]).
Similarly, in People v Bevilacqua (45 N.Y.2d 508, supra), the police ignored or rejected the 18-year-old defendant's request to telephone his mother and concealed the location of defendant's *56 whereabouts from his attorney, ignoring his instructions not to question the defendant. This Court held that the misconduct of the police, which was "seemingly planned and deliberate," mandated suppression of the defendant's written and oral confessions despite the fact that defendant was not a legal minor (id., at 514). The particular reliance on this case by the dissent overlooks these many critical distinctions (dissenting opn, at 61).
Moreover, where there has been "[n]o attempt * * * by the police to conceal the presence of the defendant or to deceive the family," we have held that "a refusal by the police to allow a parent to see [a] child [does] not * * * render any subsequently obtained confession per se inadmissible" (People v Townsend, 33 N.Y.2d 37, 42, supra; see also, People v Taylor, 16 N.Y.2d 1038; People v Hocking, 15 N.Y.2d 973).
Defendant acknowledges that the police did not engage in deception or trickery to isolate him from his mother or the other adults who attempted to see him. Defendant's sister was told his whereabouts, and his mother was prevented from seeing him when she first arrived at the station house only because the police reasonably believed that they were dealing with an adult and, therefore, were lawfully questioning him alone. We conclude that appellant's argument in this regard provides no basis for disturbing the lower courts' denial of suppression on the legal theory or on the undisturbed supportable evidentiary record (see, People v Winchell, 64 N.Y.2d 826, 827).
Defendant unpersuasively also urges that his statements should be suppressed because the police violated CPL 140.20 (6). After a warrantless arrest of a juvenile offender, the police are required to "immediately notify the parent or other person legally responsible for [the juvenile's] care or the person with whom [the juvenile] is domiciled, that the juvenile offender has been arrested, and the location of the facility where [the juvenile] is being detained" (CPL 140.20 [6]). For the crimes at issue here, a perpetrator is designated a juvenile offender up to the age of 16 (CPL 1.20 [42]). It was ultimately confirmed that defendant was 15 at the time of the crimes and questioning and could, therefore, be prosecuted as a juvenile offender.
This Court has held that failure to strictly comply with the analogous notification requirement of the Family Court Act (Family Ct Act § 305.2 [3] [dealing with the different and lower *57 level of responsibility of juvenile delinquents]) does not necessarily require suppression where a good-faith effort at compliance has been made. In Matter of Emilio M. (37 N.Y.2d 173), the juvenile was arrested, identified by the victim and taken to the station house before his mother was notified. He was then questioned before she arrived at the station house. After her arrival, the juvenile was re-Mirandized and requestioned in her presence and his statement was reduced to writing. This Court held that the procedure employed "did not constitute such noncompliance as to require suppression of [the juvenile's] signed statement" (id., at 176). "[W]hile it [was] true that no call was put through to respondent's mother until arrival at the station house, the call was made without undue delay and there was reasonable justification for such delay as did occur" (id., at 176 [emphasis added]). Thus, we held that "[i]n these circumstances * * * there was compliance with [the] statutory mandate" (id., at 176). Here, there was initially no arrest; rather, defendant voluntarily accompanied the police to the precinct. Defendant provided them with "reasonable justification" to believe he was legally an adult. Moreover, even if during the questioning the defendant's subjective state of mind or sense of freedom to leave changed because of his own inculpating statements, suppression is not even available under the analogous Family Court Act provision construed in Emilio M. We said there:
"[S]ince there [was] no evidence of willful or negligent disregard of the statutory requirements in this case and no evidence of inattention to such requirements as a pattern or practice, no sufficiently useful prophylactic purpose would be served in penalizing the police for failure to conform to the terms of the statute taken literally" (id., at 177).
In an equally cogent application of that rationale to this criminal juvenile offender situation, the police here repeatedly sought to ascertain defendant's correct age. Defendant's own repeated affirmative deceptions, which led the police to believe that he was a legal adult, supplied a lawful basis to question him without parental or guardian notification or presence so long as adult protections, like Miranda warnings, were attended to, which they were. There is ample evidence and findings by the courts below, with appropriate fact-reviewing powers, that the police diligently attempted to comply with all statutory and constitutional responsibilities, and actually did *58 so, when lawfully required within the framework of the fast-developing investigation. In contradistinction, the dissent makes significant inferences and fact-like assertions concerning seriously improper motivations of the investigating law enforcement officials (dissenting opn, at 63, 64), despite this Court's lack of power to engage in such analysis (NY Const, art VI, § 3 [a]; see also, People v Centano, 76 N.Y.2d 837, 838).
Notably, as to other persons being dealt with during this intense investigation, when the police were aware that an individual they had detained was under 16, they waited. In at least one case, they waited several hours until the juvenile's parents were present before conducting any questioning. Appellant's questioning, without additional youth protective protocols, was driven by his deception of the police at the outset that he was of adult age. On this record, we cannot say that he was deprived of any rights he was entitled to or claimed.
Defendant's other arguments have been reviewed. They are without merit and do not affect the substantive or procedural regularity or correctness of the lower courts' decisions upholding this juvenile offender's conviction.
Accordingly, the order of the Appellate Division should be affirmed.
TITONE, J. (dissenting).
This case concerns a horrible and brutal crime that captured and held the public's attention for more than a year. It also involves the conduct of police officers and an Assistant District Attorney who obtained a confession from a 15-year-old boy by keeping him in isolation from the three concerned adults who came to the police station to help him. Because the officers' actions represented a deliberate effort to keep him away from all responsible individuals who might have offered counsel or assistance, I would reject the holdings of the courts below and hold instead that the resulting confession must be suppressed.
Although the majority briefly sketches the circumstances surrounding defendant's detention and interrogation, they are sufficiently important to bear further elucidation. At a little after 10:30 P.M. on the day after the highly publicized crime occurred, Detective Taglioni and three other detectives went to defendant's home and "asked" him and his two companions to come to the police station for questioning. Defendant "voluntarily" accompanied the detectives, while his sister called an aunt who lived near the police station, Marilyn Hatcher, and asked her to go to defendant's aid. Hatcher left for the *59 police station with her fiance almost immediately, arriving at approximately 11:10 P.M. By that time, defendant had arrived at the police station and had been taken to the Sex Crimes Office for questioning.
A Detective McKenna read defendant the Miranda warnings and obtained a waiver of his rights just as Hatcher reached the police station and told an officer that she wanted to see her nephew. After being asked to wait for a few minutes, Hatcher was told by Detective Taglioni that defendant was currently being questioned, that she would not be permitted to see him because she was neither a parent nor a guardian and, finally, that defendant would not even be given the information that "some of his family was there."
Approximately 15 minutes later, David Nocenti, a United States Attorney who happened to be defendant's "Big Brother", arrived. Having learned from Hatcher that she had been prevented from seeing defendant, Nocenti approached the desk officer and informed him that he was a friend of defendant's family as well as an attorney. Nocenti was asked to wait while Assistant District Attorney Fairstein, the head of the Sex Crimes Prosecution Unit, was informed of his presence. Fairstein conferred with one of the detectives who was involved in defendant's questioning and ascertained that defendant had already made a number of inculpatory statements. Fairstein did not suggest that the questioning should be suspended because of Nocenti's presence. Instead, she approached Nocenti, told him that he had no right to be at the precinct and questioned his ethics as an attorney. Significantly, Nocenti had made it clear that he was there not in his capacity as an attorney, but rather was there as a friend of the family who wanted to aid defendant. At 11:40 P.M., Fairstein told Nocenti that he could not see defendant and that he would have to leave the premises because he was neither an immediate family member nor an attorney representing the suspect. As in the case of Marilyn Hatcher, defendant was not informed that Nocenti had come to the precinct to see him.
Within minutes, defendant's mother arrived and encountered Hatcher and Nocenti, who were waiting outside the precinct. The entire group then reentered the precinct and informed the desk officer that defendant's mother was now there. After waiting for a few minutes, Fairstein and another Assistant District Attorney spoke with defendant's mother and told her that she would be permitted to see him after the questioning had been completed.
*60 After conferring with Nocenti outside, defendant's mother went back inside, this time demanding that she be permitted to see her son immediately. It was then that she revealed for the first time that defendant was 15, not 16 as the authorities had previously been led to believe. Apparently caught off guard, Fairstein bickered with defendant's mother and Detective Taglioni for a few minutes before deciding to call a halt to the interrogation. Even then, the questioning did not immediately stop. Instead, it merely shifted to the subject of defendant's age and how it had been misrepresented on his identification card.
In all, defendant was questioned for an hour and a half before the interrogation was terminated. During that entire period, unbeknownst to him, there were related and/or concerned adults who were present and could have provided him with helpful counsel had they not been denied all access to him. What emerges from these facts is a picture of law enforcement officers who were so anxious to extract a full and complete confession that they did everything within their power to keep this youthful suspect isolated and away from any adults who might interfere with their exploitation of "the awesome law enforcement machinery possessed by the State" (People v Cunningham, 49 N.Y.2d 203, 207).
The majority finds no legal authorities that would forbid such conduct in the absence of some form of additional trickery or deception. I disagree. In an early line of cases, this Court held that a "denial of access to the defendant's family [i]s germane, but in no wise controlling on the question of voluntariness" (People v Burd, 18 N.Y.2d 832, 833; accord, People v Hocking, 15 N.Y.2d 973; People v Taylor, 16 N.Y.2d 1038). However, the categorical position represented by the line of cases on which the majority relies (see, majority opn, at 56) was long ago modified by important intervening precedent.
In People v Townsend (33 N.Y.2d 37), the Court ordered suppression of a statement where the police had deliberately lied to a 17-year-old suspect's mother to prevent her from knowing that he was even in police custody. Townsend is, admittedly, not directly supportive of defendant's position here, since its holding rested on the Court's conclusion that "it is impermissible for the police to use a confession * * * when, in the course of extracting [it], they have sealed off the most likely avenue by which the assistance of counsel may reach [the suspect] by means of deception and trickery" (id., at 41 *61 [emphasis supplied])  a condition not present here. However, the subsequent decision in People v Bevilacqua (45 N.Y.2d 508) clarified the Court's position and, in the process, adopted a view that is directly relevant to the issue presented here.
In Bevilacqua, the police first obtained an oral confession despite the defendant's repeated requests to speak to his mother. They then extracted a written confession after misleading the defendant's attorney about his whereabouts. On the defendant's appeal, this Court directed the suppression of both statements, including the oral one that had been obtained before the suspect's attorney "entered the proceeding." In so ruling, the Court noted that the defendant's attorney might have "entered the proceeding" at an earlier point if the defendant's request to see his mother had been honored (id., at 514). In words that are particularly instructive in this case, the Court specifically identified as "[c]rucial" "the continuing effort by the police to prevent defendant from establishing contact with anyone who might be able to provide him with assistance or advice" (id., at 514).
It is evident from both the result and the rationale in Bevilacqua that the holding was not limited to a situation in which the police use deliberate trickery and deceit, as the majority suggests (majority opn, at 56). Indeed, if a narrow rule based on the use of chicanery had been intended, there would have been no reason for the Court to suppress the defendant's oral statement, which was made before the deceived attorney had even arrived. The narrow construction that the majority now gives to the Bevilacqua decision is also belied by the opinion in People v Casassa (49 N.Y.2d 668, 681-682), in which the Court rejected a mentally ill defendant's Bevilacqua claim but suggested that the outcome might well have been different if "the record supported the inference that the police intentionally deprived the defendant of access to his family in an effort to obtain a confession." Once again, the Court's focus was on the denial of access, not the use of trickery and falsehoods.
Two subsequent developments in the case law are also pertinent. People v Fuschino (59 N.Y.2d 91, 100) established the principle that relief is unavailable if the police do not deprive a 19-year-old suspect of access to family members "in an effort to bar his exercise of his right to counsel and to obtain a confession" (accord, People v Winchell, 64 N.Y.2d 826, cited in majority opn, at 56). And, People v Crimmins (64 N.Y.2d 1072) *62 held that the voluntariness of the confession of a "competent adult" who has not asked for an opportunity to speak with family members is not affected by the fact that the police have denied such family members access. Neither of these cases, however, addresses a problem such as the one presented here, where the detained suspect was a minor.
In this regard, the majority's suggestion that the police "reasonably believed that they were dealing with an adult" (majority opn, at 56) is fallacious. Even assuming, as the police justifiably did,[*] that defendant was 16 at the time he was questioned, it cannot be said that he was actually an adult in any realistic sense of that term. To be sure, our statutes would permit him to be tried as if he were an adult for the serious crimes of which he had been accused (see, CPL 1.20 [42] [2]). Furthermore, under CPL 140.20 (6) and Family Court Act § 305.2, he could be arrested without immediate notice to his parent or guardian. None of these statutory provisions, however, negate the elemental fact that defendant was, at most, 16 years old and, under our State's law, an infant for most purposes (see, e.g., CPLR 105 [j]; Civil Rights Law § 1-a; Correction Law § 2 [13]; Domestic Relations Law § 2; EPTL 1-2.9-a; Judiciary Law § 1-a; General Obligations Law § 1-202). As such, unlike the detainees in Crimmins and Fuschino, defendant had neither the maturity nor the experience to protect his own rights in the inherently coercive, police-dominated atmosphere in which he found himself. Thus, as was recognized in Bevilacqua, he should have been permitted to establish "contact" with the adults who were waiting outside to see him and "who might be able to provide him with assistance or advice" regarding the seriousness of the situation and the need for consultation with counsel before making statements that would irrevocably prejudice his legal position (see, People v Bevilacqua, supra, at 514).
Furthermore, there can have been no other reason for the decisions of Detective Taglioni and Assistant District Attorney Fairstein to prevent defendant's aunt, "Big Brother" and mother from speaking to him other than to capitalize on his youth and isolation and to assure that he did not receive aid and advice from the supportive adults who were in a position *63 to retain counsel for him. Indeed, it is apparent that the authorities' purpose was to obtain the evidence they wanted before permitting defendant to speak with an adult who might interfere with the investigators' absolute control over his person and environment (see, People v Bevilacqua, supra, at 514). In other words, "the police intentionally deprived the defendant of access to his family in an effort to obtain a confession" (People v Casassa, supra, at 681-682).
Contrary to the majority's assertion, the foregoing conclusion requires no impermissible inference drawing. Assistant District Attorney Fairstein made the authorities' motives in this regard explicit when she told defendant's mother that she would not be permitted to see her son until after the detectives were finished with their questioning. This declaration that defendant would continue to be isolated despite the presence of his mother at the police station belies the suggestions made earlier to Hatcher and Nocenti that the only reason they were being denied access was that neither was a parent or a person who had come to provide legal representation.
Finally, defendant's need for an adult perspective in this situation is highlighted by the cynical manner in which the detectives manipulated the information they gave him in order to induce a confession. The detectives told defendant that he had been implicated in the crime by others but that it was possible that he could still be released "depending on what [he] ha[d] to tell [them]." When defendant balked, the officers told him, falsely, that they were able to lift fingerprints from the victim's jogging pants. At that point, defendant, perceiving no alternative, acceded to the police pressure and began giving the inculpatory statements that had subsequently convicted him.
Manifestly, an experienced adult could have disabused defendant of the naive notion that there was anything he could say to police that would result in his release at this stage in the investigation. Certainly, a knowledgeable adult  or an attorney retained by such an adult  could have alerted him that he could not extricate himself from the most serious charges merely by denying having directly participated in the rape. In any event, defendant's aunt, "Big Brother" or mother could have helped this 15-year-old suspect to appreciate the value of waiting until after he had spoken to an attorney before committing himself to the inculpatory statements he was in the process of making.
*64 In sum, other than an undisguised intention to exploit this defendant's youthful vulnerability, there was no justification for the authorities' actions in preventing defendant from gaining access to the helpful counsel of the supportive adults who had gathered at the police station to assist him. Accordingly, I would hold that the statements the police obtained as a result of their overreaching ought to have been suppressed. Such a holding is necessary, in my view, both to deter the abuse of police authority and to protect the right to counsel of those who are too young and naive to appreciate its importance. Because the analysis and holdings of the courts below, and of the majority here, fail to give adequate weight to the rights of this unrepresented juvenile, I dissent from the decision to uphold his conviction.
Order affirmed.
NOTES
[*] I do not dispute the majority's conclusion that the police cannot be faulted for failing to accord the statutory protections of CPL 140.20 (6) or Family Court Act § 305.2 when the suspect has misrepresented his age and there is no objective basis for doubting the suspect's false claim.