■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DALE WARREN, Appellant. [750 NYS2d 670] —Spain, J. Appeal from a judgment of the County Court of Ulster County (Bruhn, J.), rendered July 25, 2000, upon a verdict convicting defendant of two counts of the crime of manslaughter in the second degree.

Defendant was indicted by an Ulster County grand jury on two counts of murder in the second degree for his actions on April 27, 1999 at his home in Sundown, Ulster County, around 4:30 A.M. which caused the death of his seven-week old infant, Brody. At the ensuing jury trial, the People presented expert medical testimony of the pathologist who performed the autopsy and concluded that the cause of death was "blunt force injuries of the head and brain," resulting in brain swelling; that the injury was attributable to a tremendous force or impact to the front of the infant's head less than 12 to 24 hours before death and not to an accidental fall; and retinal hemorrhage and acute hemorrhage to portions of the spinal cord were detected. Also noted was a subdural hematoma on the left back side of the infant's brain which the expert opined was at least several days old, caused by either blunt force trauma or shaking, and which was not a cause of death.

A State Police investigator testified that, during questioning

at the police barracks, after providing differing accounts of what had transpired including that the infant had choked and accidentally fallen, defendant confessed, "I killed my son Brody." After receiving *Miranda* warnings and waiving his rights, defendant explained, in a statement later reduced to writing, that he had arrived home from work between 2:30 A.M. and 3:00 A.M. and went to bed; around 4:00 A.M. he heard the infant stirring and his efforts to feed, change and calm the crying infant were unsuccessful. Exhausted and frustrated, "he picked Brody up over [his] head by the waist and threw him down hard on the floor [and] his head twisted and he bounced off the floor." The infant began struggling to breath and stopped crying; defendant awoke the infant's mother who called 911 at approximately 4:48 A.M. The infant stopped breathing and, despite subsequent emergency measures to revive him, he was pronounced dead at a hospital emergency room at around 6:37 A.M. Several witnesses, including defendant, testified to defendant's account that in the weeks before this incident, defendant had accidentally bumped the infant's head on a table.

Defendant's medical expert testified that the constellation of injuries to the infant reflected that the cause of death was whiplash shaken infant (or impact) syndrome which resulted from shaking and an impact to the front of his head, causing brain swelling. Defendant's expert opined that the infant's injuries were contemporaneous and were consistent with his head striking an adult's head, but not consistent with being dropped or falling to the floor. Defendant testified, contending that while trying to quiet his son and allow the infant's mother to sleep, he shook him and their heads hit together. The jury convicted defendant of two counts of manslaughter in the second degree, for which defendant received concurrent indeterminate sentences of 5 to 15 years' imprisonment.

On appeal, defendant assigns error to County Court's ruling, following a *Huntley* hearing, denying his motion to suppress incriminating statements that he made to members of the State Police on April 27, 1999. However, the testimony adduced at the suppression hearing fully supports the court's determination that the questioning of defendant was noncustodial and investigatory up until his admission to killing his son, at which time *Miranda* warnings were provided as required (*see People v Centano*, 76 NY2d 837, 838; *People v Yukl*, 25 NY2d 585, 588-589, *cert denied* 400 US 851; *People v Bolarinwa*, 258 AD2d 827, 828, *lv denied* 93 NY2d 1014; *People v Hardy*, 223 AD2d 839, 840-841; *see also People v Strawbridge*, 299 AD2d 584). The suppression testimony demonstrated that on the day of

the infant's death, defendant voluntarily agreed to speak with investigators and was transported at approximately 5:20 P.M. from his home to the police barracks located about one-half hour away, where he answered questions about what had occurred. After providing various accounts and being further questioned regarding how the infant died, defendant admitted killing his son and was promptly advised of his *Miranda* rights. To that point he had not been handcuffed, frisked or restrained. He had been offered food, drink and cigarettes (some of which he accepted) and never requested to contact an attorney, that questioning cease or to leave; he was never accused of any wrongdoing or confronted with any incriminating information, the atmosphere of the interview was not inordinately coercive or unduly long and defendant was cooperative (*see People v Centano, supra; cf. People v Macklin*, 202 AD2d 445, 446, *lv denied* 83 NY2d 912). While the police knew from the autopsy that they were investigating a possible homicide and that witnesses had placed defendant alone with the infant just prior to his death, defendant was not told the autopsy findings or that he was a suspect so as to transform the investigation into a custodial interrogation (*see People v Pulliam*, 258 AD2d 681, 682, *lv denied* 93 NY2d 977; *People v Ripic*, 182 AD2d 226, 234, *appeal dismissed* 81 NY2d 776).

Promptly after defendant confessed, he received *Miranda* warnings and he waived his rights—expressly stating he did not need an attorney—and thereafter provided a detailed, written statement and then a taped oral statement, both containing the *Miranda* warnings, in which he admitted killing his son by throwing him on the floor. The totality of circumstances supports County Court's conclusion that, despite his fatigue and grief, defendant indeed voluntarily, intelligently and knowingly waived his rights (*see People v Bolarinwa, supra* at 829). Given these facts, defendant's suppression motion was properly denied.

Finally, we are unpersuaded by defendant's remaining contention that his extreme remorse, lack of criminal history and other mitigating factors render the maximum sentence of 5 to 15 years harsh and excessive, in view of the undeniably tragic consequence of his reckless conduct (*see People v Mitchell*, 289 AD2d 776, *lv denied* 98 NY2d 653; *People v Roy*, 245 AD2d 878; *People v Peck*, 192 AD2d 746, 747).

Cardona, P.J., Mercure, Peters and Rose, JJ., concur.
Ordered that the judgment is affirmed.