People v Spruill (2004 NY Slip Op 50396(U))

[*1]

People v Spruill

2004 NY Slip Op 50396(U)

Decided on May 7, 2004

Supreme Court, Westchester County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 7, 2004

Supreme Court, Westchester County
 THE PEOPLE OF THE STATE OF NEW YORK
against
JOHN SPRUILL, Defendant.
Indictment No. 03-0039

Andrew C. Quinn, Esq.
Quinn, Ferrante & Mellea, L.L.P.
Crosswest Office Center
399 Knollwood Road
Suite 220
White Plains, NY 10603
Hon. Jeanine Pirro, Esq.
District Attorney of Westchester
111 Dr. Martin Luther King Jr. Boulevard
White Plains, NY 10601
ATTN: A.D.A. George L. Bolen

MARY H. SMITH, J.
The defendant herein stands accused of Murder in the Second Degree (Depraved
Indifference) and Manslaughter in the First Degree for the homicide of his 83 year old aunt,
who was his surrogate mother. Pursuant to a Decision and Order rendered by Hon. Sam
Walker, Westchester County Court Judge, on November 18, 2003, this Court held a
hearing pursuant to People v. Huntley, 14 NY2d 72 (the "Huntley hearing") on April 26 and
April 28, 2004 to determine the voluntariness of alleged statements made by the accused to the
police, and to determine what impact if any, police procedures had on the accused's Fourth and
Sixth Amendment rights.
[*2]
Before the hearing, the People withdrew the first noticed statement allegedly made by the accused at 53 Crane Avenue, White Plains, New York at approximately 11:00 a.m. The remaining noticed statements, i.e., an oral statement made at police headquarters on
January 3, 2003, at 11:30 a.m., an oral statement made at police headquarters on January 3, 2003 at approximately 2:52 p.m., a written statement signed by the accused at approximately 7:51 p.m. on January 3, 2003, and a videotaped statement made at approximately 8 p.m. on January 3, 2003, all made by the defendant in the absence of counsel, were the subject of testimony and the Court's evaluation at the hearing. The Prosecution also introduced evidence of a police-elicited statement by the defendant that has not been subject of a previous CPL § 710.30 notice to the defense. The defense did not challenge the legality of the testimony given by John Spruill to the Grand Jury on July 3, 2003.
The hearing testimony disclosed the following:
On Thursday January 2, 2003, John Daly, currently retired as a Detective of the White Plains Police Department, was on duty and learned that "friends" of the deceased, Anelia Walker, age 83, had contacted the police that night with regard to their suspicions as to her cause of death two days earlier. Det. Daly spoke with Ms. Walker's neighbor, Lucy Novak, who stated that, just before her sudden death, Ms. Walker had been talking to her on the phone and announced that her nephew, the accused, had just arrived at the door. Det. Daly also discovered on January 2 that the deceased was about to be cremated at Ferncliff Crematory and called an emergency number there to effect a stay of the cremation; he also called the Medical Examiner's Officer to "open a file" on the case and asked them to pick up the remains of Ms. Walker at Ferncliff Crematorium for an autopsy.
The following day, January 3, Det. Daly and his partner, Det. Cuozzo, went to Ms. Walker's home at 53 Crane Road, White Plains, in response to a police guard's report of the appearance of the accused at the front door. Det. Daly, who learned from the accused that he was there to feed Ms. Walker's cats, told him that he was interested in talking with him as some neighbors had some concerns about Ms. Walker's death. The accused agreed to come down to headquarters for an interview, and followed the police in his own car.
At headquarters, the accused spoke to the Detectives about his aunt's death without the benefit of any Miranda Warnings. In substance, he stated that after work on December 30, 2003, he went to his Aunt's house at about 9:30-9:45 p.m. to deliver some cat food and newspapers. After he rang the bell and received no response, he opened the door with his own key, and thereupon discovered his aunt, Ms. Walker, lying prone on the kitchen floor. He checked her pulse and it was weak. He scooped her up and carried her out the front door to his car and drove her to the Emergency Room at the White Plains Hospital. There, he and the medical staff discussed the possibility that his aunt had suffered a heart attack and the nurses connected Ms. Walker to life support. Later at the hospital, he signed a "DNR" order (Do Not Resuscitate), and went back to the house at 53 Crane Road to rest.
Subsequent to this first interview, Det. Daly immediately conferred with his supervisor, who related that he had been notified that the Medical Examiner had completed the autopsy and had ruled the death a homicide. Det. Daly left headquarters to accompany two Assistant District Attorneys to the Medical Examiner's Office, where the group conferred with the Medical Examiner. Upon their return to Police headquarters, Det. Daly met with his supervisor and Det. [*3]Eric Fischer, who was now assigned to join him to in a re-interview of the accused, who was still waiting in the interview room.
Dets. Fischer and Daly proceeded to the interview room, this time armed with a Miranda Warnings card (PE 4), which was read to the accused by Det. Fischer.[FN1] At 2:51 p.m. the accused signed the card and waived his rights. For the next three hours, during questioning, the accused eventually changed his story to indicate that in fact his aunt had been alive when he arrived at her house on December 30 and had let him in the front door. She was very angry over the status of some renovations the accused was doing upstairs at her house and "hollered" at him until she "lost it and came at him" and scratched his right hand. The accused "lost his temper" and shook his aunt by her shoulders snapping her head back. She immediately fell to the floor and as he tried to stop her fall, he fell on top of her with his arms on his chest. He checked her pulse and, finding it weak, took his aunt to the Hospital. The accused told the Detectives that he lied before because he was afraid and felt terrible. At 5:51 p.m., the accused and Det. Fischer began work on a typewritten statement to reflect this version of events (PE 5). The accused signed it, and initialed both the printed Miranda Warnings and typed disclaimer concerning voluntariness at the top of the statement. The defendant also signed two consent to search orders, one for 53 Crane Avenue house and one for his own residence in Mahopac. Det. Daly asked him, "Have you removed anything from his Aunt's house? The accused said yes, he had taken "a pasta bowl and a will." This statement had not been previously noticed to the defense under CPL § 710.30.
 At approximately 8 p.m., the accused agreed to be videotaped in an interview with Det. Fischer. After reading the accused his Miranda Warnings again, Det. Fischer elicited a statement from the accused similar to his signed statement. In the video, the accused demonstrated on the Detective the brief physical confrontation between himself and his aunt. The accused was described as being six feet two and approximately two hundred thirty pounds;[FN2] Ms. Walker was described as being five feet and one hundred pounds.
Counsel for the defense has conceded that there is no issue in this case as to voluntariness of any of the statements. The accused was never handcuffed, and was offered food and beverages [*4]during the interview process. Defendant himself, in his testimony in front of the Grand Jury, described his treatment by the Detectives as " very nice".[FN3] Nor does the defense dispute that the accused was properly given his Miranda Warnings on January 3, 2003 at 2:51 p.m. and that he waived those rights.[FN4]
 LEGAL DISCUSSION
There are two issues to be addressed as a result of this hearing:
1) Was the accused de facto in custody at the time he first entered police headquarters on January 3, necessitating prompt Miranda Warnings, and in their absence, requiring suppression of the first oral statement and close scrutiny of the ensuing statements as fruit of the poisonous tree?
 2) Was the defendant's unnoticed statement in substance that he returned to his aunt's house to get a pasta bowl and a will admissible on the People's direct case if not suppressed for constitutional reasons at the hearing?
1. The First Interview Was Not The Product Of Police Custodial Interrogation
Whether or not a person is in police custody, triggering constitutional safeguards and a reading of Miranda Warnings at the outset of an interview, is a question of fact calling for close scrutiny of all of the circumstances of the initial contact between police and individual. (People v. Centano 76 NY2d 837). The circumstances must be measured against the
"reasonable man" standard set by People v. Yukl, 25 NY2d 585, 589, cert. denied, 400 US 851, to wit: whether a reasonable person, innocent of any crime, would in the defendant's position, not think that he was free to leave. The factors to be considered may include: (1) the amount of time spent with the police; (2) whether the person's freedom of action was restricted;
(3) the location and atmosphere under which the questioning took place; (4) the person's degree of cooperation; (5) whether constitutional rights were administered; and (6) whether the questioning was investigatory or accusatory in nature. (People v. Hardy, 223 AD2d 839, 840; citing People v. Macklin, 202 AD2d 445, app. denied, 83 NY2d 912.)
Here, the accused agreed to discuss the case with the police and followed the police to headquarters in his own car. No physical restraints of any kind were used on Mr. Spruill. Indeed, he described the police treatment of him throughout the interrogations of January 3 as "very nice. " (See PE 17B - Defendant's Grand Jury Testimony at 43, lines 2-8). He had access to a phone at all times, as he had his own cell phone on him during the interviews. During this time, his person was never searched. During the first interview, the police did not attempt to challenge his version of the events nor did they display any evidence that would prompt an inculpatory statement by the accused. Instead, the initial interview, which took approximately 40 minutes, could be seen as mere investigatory questioning. Although the police never told Mr. Spruill he was free to leave headquarters, he did not inquire about the possibility of doing so. (People v. Woroncow, 191 AD2d 530, 531, app. denied, 81 NY2d, cert. denied, 510 US 970). Far from being an atmosphere where police pressure and coercion were present, here the accused calmly gave the police an exculpatory explanation of discovering his aunt's apparently lifeless [*5]body. Under these or similar circumstances, the courts in New York have consistently found such questioning to be noncustodial in nature. (People v. Delfino, 234 AD2d 382, app. denied, 89 NY2d 1034; People v. Gomez, 192 AD2d 549, app. denied, 82 NY2d 806; People v. Spellman, 168 AD2d 318, app. denied, 77 NY2d 1001; People v. Madison, 135 AD2d 655, aff'd, 73 NY2d 810; People v. Warren, 300 AD2d 692, app. denied, 99 NY2d 621; People v. Diaz, 84 NY2d 839; People v. Lisojo, NYLJ, Feb. 23, 2004 at 17, col. 1 [Sup Ct, Bronx County, Fisch, J.]) Therefore, since the accused was not in police custody during the initial statement, no Miranda Warnings were required. Morever, since the statement was freely and voluntarily given, without any indication of police pressure or use of deceit, the defendant's motion to suppress will be denied. As to the subsequent statements - - the oral statement given at 2:51 p.m., the signed written statement completed at 7:51 p.m. and the videotaped statement at 8 p.m.  each was preceded by a rendition of the Miranda Warnings and by the accused's original initialed waiver, which was signed at 2:51 p.m. (PE 4). Therefore, these subsequent statements were given during an approximate six-hour period when the accused was given food and drink, and never asked for counsel. The defendant's motion to suppress these subsequent statements given in custody must also be denied.
2. The Accused's Statement Previously Unnoticed By The People Pursuant to CPL 
 § 710.30(3) Is Admissible
During the Huntley hearing, Det. Daley stated that the accused signed two consent to search forms on January 3 for the aunt's residence at 53 Crane Road and for his own home in Mahopac. When asked by the Detective if he had taken anything out of the house at 53 Crane Road, Mr. Spruill stated, in substance, "only a pasta bowl and a will." The People did not include this alleged statement in their CPL § 710.30 notices to the defense.
The People argue that, pursuant to the Huntley hearing and in their anticipation of the Court's decision to deny suppression of all of the defendant's alleged statements made on January 3, a reading of CPL § 710.30 (3) supports proffer of such statement on the People's direct case. 
In his omnibus motion, defendant attacked the constitutionality of the statements
allegedly given by the Defendant in a general fashion, demanding a hearing.[FN5] In People v. Kirkland, 89 NY2d 903, the Court of Appeals wrote:

"When the People intend to offer identification testimony from a witness, a notice of intent must be served upon the defendant specifying the evidence which the People intend to offer (CPL § 710.30[3]). The notice requirement is excused when a defendant moves for suppression of the identification testimony (CPL § 710.30[3]); People v. Merrill, 87 NY2d 948; see also, People v. Lopez, 84 NY2d 425, 428). Since the defendant here moved to suppress the identification testimony and received a full hearing on the fairness [*6]of the identification procedure, any alleged deficiency in the notice provided by the People was irrelevant."
(People v. Kirkland, 89 NY2d at 904-905).
Of course, since CPL § 710.30 notices apply to defendants' alleged statements as
well as to identification procedures, the provisions of CPL § 710.30(3) as enunciated
by the Kirkland court must prevail here as well. (People v. Quinto, 245 AD2d 121; People v. Quesnel, 238 AD2d 725, app. denied, 90 NY2d 896; People v. Johnson, 280 AD2d 613). Therefore, pursuant to the Huntley hearing, the defendant's motion to suppress for defective notice of this aforementioned statement is denied.
This constitutes the Decision and Order of the Court.
Dated: White Plains, New York
 May 7, 2004
 
 Honorable Mary H. Smith, J.S.C.
 
Decision Date: May 07, 2004
Footnotes

Footnote 1:The Miranda Card, PE 4, bearing the date, time, signature of Det. Fischer and the initials "JS" for the accused, reads as follows:
 "1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before
 any questioning, if you wish one."
The waiver, on the flip side of the card, contains the handwritten word "Yes" to each of the questions:
 "1. Do you understand each of these rights I have explained to you?
 2. Having these rights in mind, do you wish to talk to us now?"
 

Footnote 2:See PE - 17B Defendant's Grand Jury Testimony at 43, lines 2-8.

Footnote 3:Id. at 120, lines 11-12.

Footnote 4: Id. at 122-123, lines 19-25; 1-10.

Footnote 5: In his omnibus motion, the defendant makes a blanket demand to suppress all statements, i.e.
"Defendant moves this Court to suppress statements he made to law enforcement officers employed by the White Plains Police Department inasmuch as all statements made by the defendant were involuntary, and were taken in violation of his constitutional rights pursuant to Miranda v. Arizona." (See Defendant's Memorandum of Law at Point II).