OPINION OF THE COURT
Norman J. Felig, J.
The defendants, employees of the Staten Island Rapid Tran *636 sit Operating Authority, were indicted for the crimes of manslaughter in the second degree and criminally negligent homicide in connection with an incident during which a pedestrian was struck and killed by a train. Defendant Mule was the engineer or motorman of the train, and defendant Pattison was the conductor.
The defendants’ motions, inter alia, to suppress the results of certain blood tests administered to them shortly after the accident, are denied.
Based on the credible evidence adduced at the hearing, it appears that shortly following the fatal accident which underlies the present indictment, the defendants were "directed” or "ordered” to submit to a blood test by Assistant Trainmaster Holmes of the Staten Island Rapid Transit Operating Authority (hereinafter SIRTOA), the foregoing in at least partial response to the request of a SIRTOA police sergeant based upon his observation of the defendants at the scene of the accident. At this juncture, defendant Mule assented in apparent compliance with operating rules requiring that the instructions of a superior railroad official be obeyed. Defendant Pattison requested an opportunity to communicate with his union representative. After he did so, Pattison returned to Holmes and asked whether he was being "ordered” to submit to a blood test, whereupon Holmes responded that he was. Pattison then consented, and blood was drawn from both of the defendants. It is the results of these blood tests which the defendants now seek to suppress on the ground, inter alia, that their consent was coerced under the threat of substantial economic sanction, i.e., discipline and removal from the railroad on the ground of insubordination (see generally, Lefkowitz v Turley, 414 US 70, 82-83; Garrity v New Jersey, 385 US 493, 499-500). In the court’s opinion, the defendants’ contentions lack merit.
It is, by now, a well-established proposition of law in New York that the results of a blood test taken, as here, without an authorizing court order are inadmissible against a defendant in any subsequent Penal Law prosecution, unless taken in accordance with the latter’s "consent” (People v Moselle, 57 NY2d 97; People v Magiera, 97 AD2d 963; People v Curran, 90 AD2d 661). Consent, in this context, be taken to mean, that the defendant’s assent was not the product of duress or coercion, express or implied (see, United States v Ramey, 711 F2d 104, 107 [8th Cir, 1983]), so that the ultimate issue to be determined herein is whether the defendants’ will in acquiesc *637 ing to the blood tests was sufficiently overborne to render their results inadmissible at their upcoming trial.* In this regard, the court is not unmindful of the fact that the bulk of the case law regarding the subsequently acquired incriminating evidence has arisen in the context of alleged violations of the US Constitution 5th and 14th Amendments (see, e.g., Garrity v New Jersey, 385 US 493, supra; Lefkowitz v Turley, 414 US 70, supra; Gamer v United States, 424 US 648), whereas the present issue regarding the admissibility of blood test results has been stated by the Court of Appeals to present a nonconstitutional issue (People v Moselle, 57 NY2d 97, 104, supra). Nevertheless, the logic underlying Garrity (supra) and its progeny is persuasive, and the court is convinced that evidence whose voluntariness would pass constitutional muster would not offend the dictates of People v Moselle (supra).
This established, the most significant aspect of the development of the law under Garrity v New Jersey (385 US 403, supra) for present purposes is the evolution of the concept that the threat of economic sanctions which will render a defendant’s consent involuntary must be "substantial” in its own right (Lefkowitz v Turley, 414 US 70, 82, supra), and that the "mere risk of any adverse economic consequence, however slight or insubstantial, that might result from [a] failure [to cooperate]” will not automatically result in suppression (United States ex rel. Sanney v Montayne, 500 F2d 411, 415 [2d Cir 1974], cert denied 419 US 1027). As the United States Court of Appeals for the Second Circuit went on to observe in People ex rel. Sanney (supra, p 415): "A statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer.’ * * * It must amount to a choice 'between the rock and the whirlpool’ ”.
Particularly relevant to the matter under review is the case of United States v Indorato (628 F2d 711 [1st Cir 1980], cert denied 449 US 1016).
In the Indorato case (supra), the defendant, a Massachusetts State trooper, was convicted, inter alia, of conspiracy to *638 commit an offense against the United States, to wit: the theft of property in interstate shipment, based, in part, upon certain admissions which he had made during an interview with his superiors and FBI agents on the afternoon of December 22, 1978. When the defendant became intransigent, a State Police detective (Lieutenant White), left the room in order to place a call to the head of the State’s detective bureau, and when the former returned, the defendant indicated that he would make a decision regarding the extent of his cooperation " '[i]f push comes to shove’ ” (supra, p 715). The detective then indicated that the moment just referred to had arrived, whereupon the defendant divulged the heretofore secreted information. In his subsequent prosecution, the defendant maintained that the responses elicited in the foregoing manner had been coerced in a fashion proscribed by the 5th Amendment, and that the product of those statements, as well as the statements themselves, must ultimately be suppressed.
The court disagreed (supra, pp 715-716):
"In the instant case, there was no overt threat that defendant would be dismissed if he refused to answer the questions asked. Defendant, however, takes the position that such threat was implied because the state police departmental rules, with which he was thoroughly familiar, provided for the dismissal of any officer who refused to obey the lawful order of superiors. This meant, he argues, that he had to answer the questions asked by Lieutenant White and Captain Cronin or face dismissal. Thus, defendant claims, he was in the same position as the officers questioned in Garrity. An examination of the rules, however, shows that defendant’s position is based on a very shaky premise. Rule 10.7 provides that '[mjembers of the Uniformed Branch shall promptly obey any lawful order emanating from any superior officer.’ Rule 10.1 states that any member who violates any provision of the rules 'may be tried by a Trial Board,’ and Rule 10.2 in turn provides that any member found guilty of such a violation following trial 'may be subject to dismissal or such disciplinary action as the Commissioner or Executive Officer may direct.’ Finally, Rule 8.2 permits an appeal from any order of dismissal to the district court.
"There is nothing in the record to suggest that the rules have been interpreted to mean that a state police officer who refuses on fifth amendment grounds to comply with an order to provide self-incriminating statements would be dismissed. The language used in the rules — providing that for violation a *639 member may be tried and upon conviction may be subject to dismissal or other disciplinary action — suggests that dismissal would not have automatically followed defendant’s invocation of the fifth amendment.
"Neither Garrity nor any of its progeny brings defendant within the ambit of the coerced testimony doctrine * * *
"In all of the cases flowing from Garrity, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure. In this case, there was no explicit 'or else’ choice and no statutorily mandated firing is involved.”
The court concluded "We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within Garrity’s cloak of protection” (supra, p 716; emphasis supplied). A similar result is called for in the instant case.
The credible evidence adduced at the hearing established that the defendants had not been threatened with dismissal if they refused to accede to Holmes’s direction, and that the rules of SIRTOA, with which all of its employees were allegedly familiar do not require their dismissal. Moreover, while the testimony of Holmes established that the defendants would have been cited for insubordination had they refused to cooperate, it was also established (1) that there are no mandatory penalties; (2) that the defendants could not be disciplined without being afforded a hearing; and (3) that even upon being found insubordinate, they might nevertheless be subjected to varying degrees of discipline, ranging from a fine or suspension all the way to dismissal. In addition, it appears that any such company determination would be subject to various levels of appeal within the respective unions’ contractual grievance procedures, and that it could thereafter be pursued by way of appeal to the National Railroad Adjustment Board (45 USC § 153).
When viewed in this context, it appears that the fears of dismissal upon which coercion is predicated in this case are far less substantial than those underlying Garrity (385 US 493, supra), and its progeny, and that they more nearly resemble the subjective-type fears branded as legally insuffi *640 cient in United States v Indorato (628 F2d 711, supra). In addition, while it may be true that the defendants were in danger of being cited for insubordination if they refused to take the blood tests, it is important to note that they were also subject to discipline for the more serious infraction of being intoxicated while on duty, and that their assent to the blood tests rendered the prospect of their "conviction” on these charges a virtual certainty. Upon reflection, it, therefore, appears to the court that if the defendants were truly motivated by fears of losing their jobs, they would have refused the direction to submit to a blood test, and taken their chances on the charges of insubordination.
For all of these reasons, the court finds, as a fact, under the totality of the circumstances revealed at the hearing, that the defendants’ claim of economic coercion cannot be sustained. Accordingly, their motions to suppress are denied.

 The element of official or police action (see, People v Ameigh, 95 AD2d 367) may be found in the instant case in the request of the SIRTOA police sergeant that the defendants’ blood alcohol level be scientifically determined.