OPINION OF THE COURT
Darrell L. Gavrin, J.
The defendant is charged with violating Penal Law § 120.14 (1), menacing in the second degree, and Penal Law § 240.20 (1), disorderly conduct.
The People seek to introduce, and defendant seeks to suppress, a written statement given by the defendant to the Port Authority police on August 16, 1998. A Huntley hearing was held before Judicial Hearing Officer Ernest Bianchi in Part HP-1 on March 31, 1998. The People called three witnesses: Lieutenant William Hanley, Detective Alex Velez and Lieutenant Michael Murphy. The defendant did not call any witnesses. This court has reviewed the hearing transcript, the court file and memoranda of law submitted by the People and the defendant to the Judicial Hearing Officer. Based upon the foregoing, and the recommended findings of fact and conclusions of law, *703 this court adopts the Judicial Hearing Officer’s findings of fact, but modifies in part the conclusions of law by denying the defendant’s motion to suppress the statement he gave to the Port Authority police.
The testimony adduced at the hearing reveals the charges in this action originate from a traffic dispute that occurred on the morning of August 14, 1997. The two complainants allege that a man followed them off the highway into a parking lot near building 14 at John F. Kennedy International Airport (J.F.K.), their place of employment. They further stated that the man proceeded to threaten them while brandishing a handgun. The complainants’ supervisor is alleged to have witnessed the incident.
That same day, the complainants reported the incident to Lieutenant William Hanley, the Tour Commander at the Port Authority Police Department’s Command Office at J.F.K. The complainants provided Lieutenant Hanley with a description of the man, his car and the vehicle’s license plate number. Later that morning, it was revealed that the vehicle in question belonged to the defendant, Robert Marchetta, a Port Authority police officer who worked at the Command Office.
Lieutenant Hanley informed Deputy Inspector Talbert, the Commanding Officer on duty at the time, about the report he received from the complainants. He instructed Lieutenant Hanley to have the Detective Unit interview the complainants and to advise the defendant not to report to his post. After being interviewed by a detective, the complainants left the Command Office. One of the complainants, David Sumbundu, returned almost immediately and told Lieutenant Hanley that the car driven by the man who had threatened them was in the parking lot. Lieutenant Hanley indicated to Mr. Sumbundu that he was aware of this information and they would investigate. Subsequently, Mr. Sumbundu inadvertently observed the defendant, in uniform, standing at a sign-in area and he told Lieutenant Hanley the defendant was the man who threatened him and his companion. Lieutenant Hanley updated Deputy Commander Talbert as to these events and he directed Lieutenant Hanley to notify Captain MacCase, Commanding Officer of the Special Investigations Unit.
On August 15, 1997, Detective Alex Velez of the Port Authority’s Special Investigations Unit was assigned the investigation. He interviewed both the complainants who essentially reiterated the version of facts they previously told Lieutenant Hanley. Detective Velez testified that he was aware *704 Captain MacCase had contacted the Queens County District Attorney’s office and that the Captain was told to call back on August 18, 1997, whereupon a meeting would be scheduled between the Special Investigations Unit and the District Attorney’s office relative to the incident.
On Saturday, August 16, 1997, Lieutenant Michael Murphy, the Executive Officer of the staif line at J.F.K., received a memo from Captain Barbara McClancy directing him to get a “handwritten” from the defendant regarding the incident of August 14th. (Hearing transcript, at 44.) Unclear about the procedures he should follow in obtaining the handwritten statement, Lieutenant Murphy called Deputy Inspector Talbert who advised him to read Rule 3[1] to the defendant prior to obtaining the written statement. Lieutenant Murphy advised Deputy Inspector Talbert that as there was a union delegate on duty that day, he would call him and have him present when he requested the handwritten statement from the defendant.
The defendant and the union delegate, Officer Michael Cardlin, were summoned to the Tour Commander’s office in building 269. When they arrived, Lieutenant Murphy advised the defendant that he “had a directive” and “needed to get a handwritten” concerning the incident on August 14th. (Hearing transcript, at 48.) After being read Rule 3, the defendant and the union delegate left the office while Lieutenant Murphy remained behind. Approximately one hour later, the defendant and the union delegate returned and submitted the written statement in question.
In a written memorandum submitted to the Judicial Hearing Officer, the defendant avers that his written statement should *705 be suppressed, because “once the District Attorney’s Office was notified of the criminal complaint lodged against the defendant, the Port Authority Police Department had an affirmative obligation to give the defendant Rule 4[2] ‘use immunity pursuant to the Police Operations Manual and the Collective Bargaining Agreement.” The defendant further contends that his constitutional and contractual rights were violated by being ordered to submit a Rule 3 statement without being advised that a criminal complaint had been filed as a result of the incident. The People argue, inter alia, that the particular circumstances surrounding when the statement was given govern its admissibility, not the terms of the collective bargaining agreement. Furthermore, the People submit that “a voluntary statement made in accordance with one’s Constitutional rights, is admissible [in a criminal proceeding] regardless of what one’s contract requires.”
CONCLUSIONS OF LAW
The case at the bar presents unique and difficult issues involving two competing fundamental interests. First, is the defendant’s Fifth Amendment right not to be compelled to be a witness against himself in a criminal proceeding. This right is *706 significant and, where appropriately exerted, privileges an individual “not to answer official questions put to him in any * * * proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.” (Lefkowitz v Turley, 414 US 70, 77 [1973].) Balanced against this right is the general public’s fundamental interest in holding public servants accountable for breaches of their trust. It is well settled that “[p]ublic employees, charged with a public trust, do not have an absolute right to refuse to account for their official actions and at the same time retain their employment.” (Matter of Matt v Larocca, 71 NY2d 154, 160.)
The defendant seeks suppression primarily on the grounds of an alleged violation of his union contract and cites in support People v Kleeman (131 Misc 2d 762 [Sup Ct, Queens County 1986]). The defendants in Kleeman, New York City police officers, sought to suppress a number of statements taken in regard to an off-duty incident in which Officer Kleeman was alleged to have discharged his weapon. (Supra, at 765.) As a result of the incident, Kleeman completed a number of required forms, including a firearm discharge report. (Supra.) This report was inadvertently lost and almost a month after Kleeman had “concededly” become the target of a criminal investigation he was asked to complete three additional reports. (Supra.) The court suppressed the new reports and found their “admission at trial would be in stark contravention of the guidelines established by [New York City Police Patrol Guide §] 118-9.”[3] (Supra, at 767.) This court has given careful consideration to this authority, but will, respectfully, chart a different course.
What the defendant seeks is an interpretation of the terms and conditions of the collective bargaining agreement, a ruling that a breach of that contract occurred and retroactive enforcement of the rights he feels are due under that agreement. This relief is not the type this court is empowered to grant (cf., People v Salzone, 98 Misc 2d 131 [Crim Ct, Kings County 1978]; People v Feinberg, 48 Misc 2d 187 [Crim Ct, Bronx County 1965]). The jurisdiction of the Criminal Court is restricted to hearing, trying and determining criminal charges, specifically misdemeanors and petty offenses (see, NY Const, art VT, § 15 [c]; NY City Crim Ct Act § 31; CPL 10.10 [3], [7]; 10.30). A remedy for a breach of this agreement is available to the defendant in the proper forum if or when he seeks redress for any job-related sanctions he might incur. Thus, in determin *707 ing whether the defendant’s statement should be suppressed, the proper avenue of inquiry for this court is to analyze the particular circumstances as presented at the time the statement was made and decide whether they were “likely to exert such pressure [on the defendant] as to disable him from making a free and rational choice.” (Miranda v Arizona, 384 US 436, 464-465 [1966].)
In a trio of cases decided in relatively close succession, the United States Supreme Court confronted and balanced the fundamental interests presented in the instant case. (Garrity v New Jersey, 385 US 493 [1967]; Gardner v Broderick, 392 US 273 [1968]; Sanitation Men v Sanitation Commr., 392 US 280 [1968].) In Garrity, a number of police officers were questioned by the New Jersey Attorney General’s Office with regard to allegations of fixing traffic tickets. Before being questioned, the officers were told that if they did not cooperate in the investigation they “would be subject to removal from office.” (Garrity v New Jersey, supra, at 494.) The officers answered the questions and some of their statements were used in subsequent criminal proceedings which resulted in convictions. (Supra, at 495.) The Court upheld the reversal of the convictions and found that the statements were the product of coercion. The Court reasoned that “[t]he choice given petitioners * * * either to forfeit their jobs or to incriminate themselves” was not truly a choice, but a selection between two evils. (Supra, at 497.)
In Gardner v Broderick (supra) a New York City police officer was summoned before a Grand Jury investigating allegations of bribery and corruption among police officers. He was asked to execute a waiver of immunity and explicitly told he would be dismissed if he did not sign. (Supra, at 275.) The officer refused and was dismissed on that basis pursuant to section 1123 of the New York City Charter. Reversing a judgment that upheld his dismissal, the Supreme Court, relying on Garrity (supra), held that a public employee could not be terminated solely for failing to waive a constitutional right. (Gardner v Broderick, supra, at 278-279.)
In a similar case decided the same day, Sanitation Men v Sanitation Commr. (supra), the Court, relying on its reasoning in Gardner (supra), held that the termination of 12 City employees for asserting their right against self-incrimination was unjustified as they had been presented with the “choice between surrendering their constitutional rights or their jobs.” (Sanitation Men v Sanitation Commr., supra, at 284.)
Under these cases, “what is proscribed as unconstitutional is to condition public employment upon a waiver of the privilege *708 against self-incrimination”. (Matter of Matt v Larocca, 71 NY2d 154, 160, supra; see also, People v Corrigan, 80 NY2d 326, 329 [1992]; People v Avant, 33 NY2d 265, 271 [1973].) Duress was inherent in the “choice” given these petitioners. As a result, they were deprived of an opportunity to make a free and reasoned decision and this is what automatically immunized the officers’ statements in Garrity (supra) and nullified the dismissals in Gardner (supra) and Sanitation Men (supra). The Court in Garrity aptly characterized the situation as one where the public employee is forced to select “ ‘between the rock and the whirlpool’ ” (Garrity v New Jersey, supra, at 498, quoting Stevens v Marks, 383 US 234, 243 [1966]; see also, Lefkowitz v Turley, 414 US 70, supra). Thus, limiting the holdings of Garrity and its progeny to cases where there is a specific choice between job loss and incrimination is constitutionally sound, as “ ‘[t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him.’ ” (Minnesota v Murphy, 465 US 420, 427 [1984], quoting United States v Mania, 317 US 424, 427 [1943].) Accordingly, when a statement or waiver of some other fundamental right has been obtained under circumstances that do not present a “Hobson’s choice” between acquiescing or immediate sanctions, courts have declined to apply the holdings of Garrity and its progeny. (United States v Indorato, 628 F2d 711 [1st Cir 1980]; People v Reed, 247 AD2d 900 [4th Dept 1998]; People v Lannon, 107 Misc 2d 996 [Sup Ct, Westchester County 1981]; see also, People v Mule, 131 Misc 2d 635 [Sup Ct, Richmond County 1986]; People v Ramirez, NYLJ, Mar. 2, 1994, at 23, col 3.)
In People v Reed (supra, at 900) the defendant, a social worker under suspicion of having misappropriated client funds, made admissions during an investigatory interview after she “was told that if she was not willing to cooperate, it ‘would shed a certain kind of light on her in terms of what her role in this whole thing was’ ”. The Appellate Division, Fourth Department, in affirming the defendant’s conviction for petit larceny and scheming to defraud, held the statements were not immunized. The Court reasoned the admissions were not made under threat of loss of employment since the defendant was not “presented with the Hobson’s choice of either waiving her rights or facing immediate discharge if she did not.” (Supra, at 900.)
In United States v Indorato (supra, at 713) the defendant, a lieutenant on the Massachusetts State Police force, was convicted of, inter alia, conspiring to steal an interstate cargo *709 shipment. He appealed the conviction claiming certain statements he made were coerced and erroneously admitted at trial. (Supra, at 714.) The statements were made during two interviews which took place over the course of one afternoon. One interview was with a State Police detective and F.B.I. agents, and the other was with his superior officer. At the former interview, the defendant refused to divulge pertinent information despite repeated questions. (Supra, at 715.) At one point the defendant stated that he would only disclose the information “[i]f push [came] to shove”. (Supra, at 715.) In response, the State Police detective stated that the time had come and demanded the information, whereupon the defendant complied with their demands. (Supra.) In rejecting the claim that his statements were coerced, the court held that the absence of an overt threat of dismissal and a statute or ordinance mandating such a procedure left the defendant outside the ambit of Garrity (supra). (United States v Indorato, supra.) The court also refused to accept the defendant’s claim that the threat of dismissal was implied based on his familiarity with State Police departmental rules which mandated the officer’s compliance with the lawful orders of superiors and provided for potential dismissal for a breach of these rules. The court reasoned that “the subjective fears of [the] defendant as to what might happen if he refused to answer his superior officers [were not] sufficient to bring him within Garrity’s cloak of protection.” (Supra, at 716.)
In the instant case, the defendant was never informed that he would be dismissed or experience any definite job-related sanction if he refused to submit a written statement to Lieutenant Murphy. While the defendant was told he “must” cooperate, he was also distinctly informed that he was not required to “give evidence against himself in connection with [the] investigation”. The advisory to the defendant that if he chose to speak, anything he said could be used in evidence at a disciplinary proceeding would, if anything, have the effect of chilling a reasonable person’s desire to speak, not coercing a potentially inculpatory statement, as is contended. Alerting the defendant that a disciplinary proceeding “may be commenced against him” did not amount to such an explicit threat that use immunity would have automatically attached to any statement he made. This caution was akin to the statement made to the defendant in Reed (supra) in that it was distinctly indefinite and speculative. Similarly, any fears the defendant might have harbored about potential disciplinary action after *710 hearing this warning would not have invoked Garrity’s protections (see, United States v Indorado, supra). If Lieutenant Murphy had read Rule 4 to the defendant instead of Rule 3, then the defendant’s written statement would have to be suppressed (see, People v Feerick, 241 AD2d 126 [1st Dept 1998]; Caruso v Civilian Complaint Review Bd., 158 Misc 2d 909, 912 [Sup Ct, NY County 1993]). Port Authority employees who are read Rule 4 are informed that they “will be subject to * * * charges which could result in [their] dismissal” if they fail to testify. However, since the defendant was not advised of Rule 4, these circumstances and the adherent consequences are not before this court. Accordingly, this court finds the statements made by Lieutenant Murphy to the defendant do not reflect the type of overt threat of imminent sanctions that would invoke the protections of Garrity (supra) thereby cloaking the defendant’s statement in use immunity.
The defendant emphasizes the fact that the Queens County District Attorney’s office was contacted prior to obtaining his statement. In the court’s opinion, this fact is not determinative and the court disagrees with the defendant that a criminal investigation had commenced the moment the District Attorney’s office was called. At the point when the defendant executed his statement, a mere 48 hours after the alleged incident, the investigation remained an interdepartmental one. There is no indication that the District Attorney’s office had any role in the Port Authority’s investigation. In fact, the evidence is to the contrary. Detective Inspector Talbert was told that a meeting date would be selected on August 18th, two days after the defendant gave his statement. Furthermore, the Port Authority’s internal investigation was clearly in its infancy on August 16th. The defendant was not arrested on the within charges until three months after he made his statement. In any event, the court is not persuaded that the mere existence of a criminal investigation would alter the application of principles enunciated in Garrity (supra).
Additionally, the totality of the circumstances did not necessitate reading the defendant Miranda warnings prior to attempting to obtain his statement. Before Miranda warnings need be given, the elements of both custody and interrogation must be present (see, Miranda v Arizona, 384 US 436, supra). The test for determining whether the defendant was in custody is an objective one (People v Centano, 76 NY2d 837, 838 [1990]; People v Yukl, 25 NY2d 585, 589 [1969]). The court must consider whether “a reasonable person, innocent of any crime *711 would * * * have believed he was in custody under the circumstances.” (People v Centano, at 838.) In the present case, the defendant was not directly questioned or interrogated regarding his actions on August 14th, rather a written statement was requested. Lieutenant Murphy requested the statement from the defendant while a union representative was present and the defendant was then permitted to leave the Tour Commander’s office with his representative to draft the statement. The fact that the defendant was under internal investigation at the time the statement was made did not render the circumstances custodial (see, People v Scott, 116 AD2d 755 [2d Dept 1986]; People v Ramirez, NYLJ, Mar. 2, 1994, at 23, col 3, supra). Under these circumstances, “no reasonable person in the defendant’s position could possibly have believed that at the conclusion of the interview he would be relieved of the shield and gun, handcuffed and taken to central booking.” (People v Ramirez, supra, at 24, col 3.)
Finally, the defendant’s position that his constitutional rights were violated by obtaining his statement without informing him that the complainants had made a report of the August 14th incident is without merit. Neglecting to disclose this information had no coercive effect. Indeed, even if the failure to apprise the defendant of all the details in the case could be characterized as a deliberate act of deception or trickery, it did not render the statement involuntary. For a statement to be suppressed on these grounds, a stratagem employed by the police must be found to be “so fundamentally unfair as to deny due process” or likely to induce a false statement. (People v Tarsia, 50 NY2d 1, 11; see also, People v Ingram, 208 AD2d 561 [2d Dept 1994].) In the court’s view, the mere fact that the existence of complainants’ report was not revealed to the defendant does not satisfy this standard.
Accordingly, the defendant’s motion to suppress the written statement he gave on August 16, 1997 is denied.

. P.D.I. 2-6, Rule 3, as incorporated in the collective bargaining agreement executed between the P.B.A. and the Port Authority police, reads as follows:
“Rule 3. Required cooperation by employees
“Before any employee may be questioned in connection with an investigation, the employee will be apprised of Rule 3, Chapter 9 of the Rules and Regulations which states:
“ ‘All employees must cooperate in authorized investigations of any act, omission or occurrence in or upon Port Authority property, (including but not limited to misconduct, accidents, crimes and the like), provided, however, that this rule shall not require any employee to give evidence against himself in connection with this investigation of an alleged act of misconduct on his part.’
“He shall also be cautioned that disciplinary proceedings may be commenced against him and that anything he says may be used in evidence in such proceedings.”

. P.D.I. 2-6, Rule 4, as incorporated in the collective bargaining agreement executed between the P.B.A. and the Port Authority police, reads as follows:
“Rule 4. Warnings required in cases of criminal investigation or criminal charges against employee
“If an employee is under arrest, or is subject of a criminal investigation, or there is a substantial likelihood that criminal charges may result from the investigation he shall be warned of his rights as follows:
“I wish to advise you that you are being questioned as part of an official investigation of the Police Division. You will be asked questions specifically directed and narrowly related to the performance of your official duties. You are entitled to all the rights and privileges guaranteed by the laws of the State of New York and New Jersey, the constitutions of these states and the Constitution of the United States, including the right not to be compelled to incriminate yourself and the right to have legal counsel present at each and every stage of this investigation.
“I further wish to inform you that if you refuse to testify or to answer questions relating to the performance of your official duties, you will be subject to Port Authority charges which could result in your dismissal from the Port Authority. If you do answer, it is our understanding that neither your statements nor any information or evidence which is gained by reason of such statements can be received in evidence against you in any subsequent criminal proceeding. However, these statements may he used against you in relation to subsequent Port Authority charges.”

. The warnings contained within New York City Police Patrol Guide § 118-9 are virtually identical to those delineated in Rule 4.