[891 NYS2d 229]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v WILLIAM LATTARULO, Defendant.

Supreme Court, Kings County, September 30, 2009

178

**APPEARANCES OF COUNSEL**

*Mahler & Harris, P.C.*, Kew Gardens (*Stephen R. Mahler* of counsel), for defendant. *Charles J. Hynes, District Attorney*, Brooklyn (*John Holmes* and *Joseph DiBenedetto* of counsel), for plaintiff.

## OPINION OF THE COURT

ALBERT TOMEI, J.

The defendant, William Lattarulo, stands charged with manslaughter in the second degree and reckless endangerment in the second degree. The court conducted an evidentiary hearing on the defendant's *Dunaway/Huntley/Mapp* motions to suppress the statements, five oral and one audiotaped, that he made before his arrest and the physical evidence recovered in his garage and home.

At the hearing, Chief Engineer Timothy Lynch of the New York City Department of Buildings (DOB), Investigator Robert Miller of the Department of Buildings Special Investigative Unit (BSIU), Inspector General Michael Carroll and Assistant Inspector General Byron Biggerstaff, both of the Department of Investigation (DOI), testified for the People. The defense called no witnesses. The court finds the People's witnesses to be credible, and makes the following findings of fact and conclusions of law:

## Findings of Fact

On March 12, 2008, the basement foundation wall of a two-story wood-frame residential building located at 795 Glenmore Avenue in Brooklyn collapsed into the construction site on the adjoining parcel at 793 and 791 Glenmore Avenue, causing the death of a construction worker who was working in the excavation site at the time of the collapse. The defendant is the owner of both the building and the construction site. This incident was investigated by the DOB Forensic Engineering Unit, led by Chief Engineer Robert Lynch, by the BSIU, who work under the auspices of the DOI, and by the DOI.

Lynch was mainly concerned with the structural integrity of the building and the excavation site and the safety of the public and the personnel responding to the emergency. He did not seek to interview witnesses or to determine the cause of the collapse. It was his job to determine whether the partially collapsed building could be shored up or would have to be taken down. The main concern of Robert Miller of the BSIU and the DOI was to determine the cause of the collapse, whether any professional licensed by the DOB had acted negligently, and whether there was any administrative or criminal liability for the incident. Miller was primarily responsible for interviewing witnesses, building owners, and the professionals involved in the building site.

Lynch is a special patrolman with no arrest powers; he does not carry a gun or handcuffs or issue *Miranda* warnings. He has the power to issue criminal court summonses for DOB violations. Lynch works in a hard hat, work pants and shoes, and a bunker jacket. "Department of Building Engineer" is written on the jacket and the hard hat has "Buildings" on the front and engineering decals. He carries a shield with "Special Engineer" written on it on his belt, under the jacket. Robert Miller is a peace officer with arrest powers. However, the DOB does not permit him to make arrests and he does not carry a gun or handcuffs. He has had training in issuing *Miranda* warnings, but has never done so and does not carry a warnings card. Miller works in a suit and tie and an official coat with DOB patches on the chest. Miller carries a shield that resembles a police detective's shield and a DOB photo identification card bearing his name and job title.

Both the engineers and the BSIU are first responders who are notified whenever a building collapse occurs. The police department, fire department and Office of Emergency Manage-

ment are also first responders and their personnel were present on the site on March 12, 2008. The police were responsible for maintaining the perimeter and keeping the public and the residents of the partially collapsed building from entering the danger zone cordoned off around the construction site and the building. The engineers set the parameters of the safety zone and determine when it is safe for first responders or the public to enter the site.

Lynch and Miller work at different locations and arrived separately on the scene in the afternoon. The safety perimeter was already in place when each man arrived. They knew before arriving that a worker had died in the collapse but were not aware of any criminal liability at that time. Miller worked with his partner, Nicholas Novalino, who was also a peace officer. Upon arrival, Miller interviewed first responders, witnesses, and building residents who were present at the scene. He asked who the owner of the building was. Approximately one hour after he arrived on the site, someone pointed to a car that was traveling slowly down Shepherd Avenue and said its driver was the building owner.

Miller walked up along side the driver's side of the car, which was going approximately five to eight miles per hour. Miller approached the car by himself, with no police or other official personnel nearby. He identified himself as a DOB investigator and showed the driver his shield and his photo identification card, speaking through the open driver's side window. He asked the driver for his name, and upon being told it was William Lattarulo, asked the defendant if he was available to discuss the incident. The defendant replied that he did not want to be there at the moment and Miller said, "That's all right, I just need to collect your personal information so that we can discuss these matters at a later time." He asked the defendant to pull over at a vacant spot. The defendant parked his car, then got out without being asked to do so. Miller asked the defendant for his driver's license to verify his identification, took contact information, and left the defendant standing outside his car. A few DOB officials approached the car and Miller observed the defendant walking away with them towards the construction fence at the street corner.

Meanwhile, Lynch inspected the building and the construction site and tried to determine whether the engineer, general contractor, or owner were on site. Lynch was seeking information relating to the work that was being done on the construc-

tion site at the time of the collapse. Another DOB employee identified the defendant to him as the owner. At approximately 1:00 P.M., Lynch walked over to the defendant, who was standing at the corner of Shepherd and Glenmore Avenues, speaking with some of the building tenants. Lynch was alone at the time and no police personnel were in the area.

Lynch identified himself by name and said that he was the DOB Chief Engineer and incident commander for the site. He asked the defendant for the names of the owner, the developer for the job site, the general contractor, the architect, the engineer and the controlled inspector. The defendant told him that he was the owner of the construction site and several contiguous lots. He said that the contractor was Greenleaf, which was owned or managed by a Mr. Babou. The architect was Brickolage, owned by Henry Ruditski and Doug Polaski. Herzberg Sanchez was the engineering design firm and Teddy Astor was the engineer keeping an eye on the foundation work as it progressed. Lynch asked him what was going on at the time of the collapse and the defendant said that two or more laborers had been working on the job site at the time, but no engineer or architect was present. The controlled inspector was also not present, although he had been there on previous days. The laborers were digging out the soil for the foundations and underpinnings when the wall collapsed. Lynch asked the defendant to remain at the site and the defendant said that he would do so. The conversation lasted a few minutes. Lynch left the defendant on the corner and went back to working on the issue of whether the building could be stabilized.

Approximately 25 minutes after he first spoke to the defendant, Miller and his partner returned to the area near the construction fence and found the defendant standing alone. Miller asked the defendant if he was available to discuss the construction incident and the defendant said that he was. Miller asked if there was a place where they could go to discuss the issue in private and the defendant led him into a garage located on Shepherd Avenue on the lot adjacent to the construction site. The defendant opened the garage door and led them inside. They sat near a table inside the garage, with the defendant closest to the door and Miller and his partner to the defendant's side. Miller took notes during this interview but did not issue *Miranda* warnings because the defendant was not being detained and was free to leave if he chose to do so.

During this interview, the defendant said that Greenleaf was the general contractor and that he was self-employed as the

supervisor on the site and was not a Greenleaf employee. He named three of the four workers on the site, but did not know the name of the fourth worker. He said that a Theodore Astor, a retired professional engineer, was acting as a consultant on the job site. The defendant told Miller that he did not know the firm Herzberg Sanchez and was not asked to name the architect. The defendant explained that at the time of the collapse, the workers were preparing the footings for the foundation of the two-story building under construction. There were some concerns about the brick foundation wall on the residential building. The wall appeared to be brittle and falling apart, so the defendant had covered it with a concrete stucco skim coat about two weeks earlier. The defendant was present at the time of the collapse. He said that he saw that the wall did not appear to be stable and told the workers to get out of the pit as the wall was falling down. There were three workers in the pit near the foundation wall at the time. At the conclusion of this interview, which lasted 10 to 15 minutes, Miller told the defendant that they would contact him if they had any further questions. Miller and his partner left the defendant in the garage.

At approximately 5:00 to 6:00 P.M., while the damaged building was being taken down by the DOB, Lynch decided to speak to the defendant again in order to see if he could provide the design drawings for the new building. Lynch asked people on the site and was told that the defendant was inside the garage on Shepherd Avenue. Lynch and another engineer went to the garage and saw that the door was open and that the defendant was inside. Lynch and his partner walked into the garage and spoke to the defendant. There were no police officers present and the defendant did not ask them to leave. Lynch asked about the professionals on the job, the workers on the job sites and to see the construction drawings, but the drawings were not available. The defendant repeated his earlier information regarding the identities of the professionals involved. He explained that the contractor was digging out the sand in the excavation for the new foundation and that the general contractor was working on the underpinning. Lynch asked the defendant to remain on the site because he was the owner and it would be helpful to have him present to make decisions about his property. The defendant said that he wanted to leave. Lynch left the defendant alone in the garage and returned to the building site.

Lynch looked for the defendant a third time later that night and could not find him. He called the defendant's cellular phone

number and spoke to the defendant who said that he was at home and did not intend to return to the site that night. Lynch remained on the site until after midnight, making arrangements for the equipment and materials needed to fill in the excavation pit in order to prevent a further collapse. The DOB engineers removed some of the underpinning pins and other materials from the site for investigation.

The next day, March 13, 2008, Miller and his partner returned to the scene and spoke with Santosh Nosh, also known as Babou, who had agreed to meet with him there. Afterwards, Miller and his partner went to the Shepherd Avenue garage and knocked on the door. The defendant opened it. Miller asked if they could speak about the incident again and the defendant let them enter. They sat at the table again, with the defendant closest to the door and the two BSIU investigators to his side. Miller set up a cassette tape machine to record the interview, with the defendant's permission. No police were present and *Miranda* warnings were not issued. The defendant was free to leave at any time or to ask the investigators to leave. The purpose of the interview was to establish the defendant's involvement with the construction site and to determine his criminal liability for the death. The District Attorney's Office was not consulted prior to this interview.

Near the beginning of the interview,[1] when asked for his side of the agreement with Babou regarding the defendant's responsibility for the job, the defendant first said that Babou now appeared to be "unagreeing" with the arrangement and then said,

> "Well, I, I think I—this is the part where I think it gets very sticky and I'm gonna have to talk to a lawyer on this here. I know what I should say and all of that but I would like to choose my words on and especially when I'm in a better frame of mind to do this."

Miller responded, "Well if, if you are ok with me asking questions." At which point, the defendant cut Miller off and continued his explanation, stating that Babou was supposed to insure him and work with him a little bit and that Babou said that the defendant could choose his own workers. The defendant explained that he was working like a freelancer for Babou. The remainder of the interview covered who the professionals

---

1. This occurred on page 11 of the 125-page transcript of the audiotape that the People provided to the court at the conclusion of the hearing.

hired to work on the site were, what they did and what they were paid, the defendant's responsibilities at the job site and his reasons for the decisions he made with regard to the work being done, the responsibilities of the workers at the site and what was being done at the time of the collapse. The construction plans and a green spiral notebook in which the defendant kept notes on the work in process were examined during the interview.

The interview lasted approximately 90 minutes, covering both sides of the tape, and was concluded when the tape ran out. It was interrupted briefly when the tape was turned over and again when the defendant answered a telephone call that came in during the interview. At the conclusion of the interview, Miller and his partner left the defendant in the garage, stating that they would contact him if they had further questions. During the interview, Miller asked the defendant if he could take a concrete form located in the garage and the defendant said that he could.

On April 4, 2008, BSIU and DOI personnel, including Miller, Inspector General Michael Carroll, Assistant Inspector General Byron Biggerstaff, and Chief Investigator Daniel Lau executed a search warrant at the defendant's Shepherd Avenue garage.[2] The team included approximately seven or eight people, including police personnel assigned to the DOI. The EMS unit was called to the scene to gain entry by removing the lock from one of the doors. The investigators entered the property at 9:00 A.M.[3]

The defendant arrived approximately 45 minutes later, while the search was being conducted. He asked what they were looking for and helped them find things. He spoke with Carroll and Miller, who asked the defendant about a computer that was present in the garage, but not listed on the search warrant. The defendant orally agreed to let them take a computer tower, stating that there was nothing in it. At 11:10 A.M., the defendant read and signed a one-page consent slip written out by Investigator Lau, stating that they had his permission to take the computer tower.

---

2. On March 17, 2008, Investigator Miller first spoke with the District Attorney's Office about potential criminal liability. Investigator Miller signed the search warrant application on March 28, 2008; the warrant was issued on April 4, 2008. The stated purpose of the search warrant was to uncover evidence of criminal liability.

3. The entry and exit from the garage to execute the search warrant were videotaped and still photographs were taken inside the garage during the execution.

Miller and Carroll then asked the defendant about the green spiral notebook construction diary listed in the search warrant. The defendant said that it was at his house and they could come and pick it up. The defendant first suggested that he drive the DOB personnel to his home and they declined, stating that they would drive in their own car. The defendant then drove to his house on Long Island in his own car, followed by Biggerstaff and Lau in a departmental vehicle. There, the defendant invited them inside and gave them the spiral notebook. At 12:05 P.M., after the notebook had been turned over, the defendant signed a second consent slip, again written out by Inspector Lau, to permit the DOB to take the green notebook from his house.

## Conclusions of Law

### The Statements

■ The defendant first claims that all of his statements must be suppressed because they were the product of an illegal automobile stop, conducted by Miller. An automobile stop constitutes the seizure of the driver and requires reasonable suspicion that a crime has been committed by the driver or another occupant of the car. (*See People v Spencer*, 84 NY2d 749, 752-753 [1995]; *People v May*, 81 NY2d 725, 727-728 [1992]; *People v John BB.*, 56 NY2d 482, 487 [1982].) When Miller approached the defendant in his car, Miller did not have a reasonable suspicion that the defendant had committed any criminal activity and was not seeking to detain him to investigate any crime. Rather, Miller was investigating an emergency situation involving a partial building collapse into a construction site in which a worker had been killed and there were questions about the work that was being done at the time and the safety and stability of both the building and the construction site. Miller, therefore, had only an articulable reason, not rising to the level of criminality, for questioning the defendant.[4]

Miller approached the defendant's car as he drove it slowly past the construction site, walked beside it on foot and identified himself by name and as a DOB investigator, showing the defendant his shield and his DOB photo identification. He asked the defendant if he was the owner of the site and was willing to stop and provide information. The defendant replied that he did

---

4. In light of its factual findings, the court has not considered the People's argument that Miller was entitled by the emergency doctrine to forcibly stop the defendant's car in order to investigate an ongoing emergency, even in the absence of reasonable suspicion.

not want to be present at that time. Miller told him that he needed only contact information and would speak to the defendant at a later time. He asked the defendant to stop the car and the defendant complied, and chose to get out of the car without any request from Miller. No police officers or police vehicles were in the immediate vicinity and Miller did not carry a gun.

On these facts, there was no automobile stop. There was no show of official authority, such as lights and sirens, or the display of a weapon, requiring the defendant to stop his car. Rather, there was a simple verbal request from a lone person on foot, who did not claim that he was a police officer or suggest that the defendant was required to comply with his instructions. Had the defendant chosen to ignore Miller and drive away, there would have been no action Miller could have taken to prevent it. Moreover, while Miller was a peace officer with the statutory authority to make arrests, it is unlikely that a member of the general public, such as the defendant, would have any reason to know this or to expect that a DOB investigator, shield notwithstanding, had any authority to force the defendant to comply with his verbal request. Therefore, this encounter did not constitute an automobile stop, but was more akin to a consensual first level inquiry under the *De Bour* test. (*See People v De Bour*, 40 NY2d 210 [1976].)

Analyzed as a street encounter, Miller needed only an objective, credible reason, not necessarily indicative of criminal activity to approach the defendant and request that he briefly stop to speak with Miller. (*See People v Hollman*, 79 NY2d 181, 189-190 [1992].) Merely directing a person to stop does not constitute a seizure unless the direction is made under circumstances indicating that the person is not free to disobey, such as at gunpoint or when surrounded by officers. (*See People v Bora*, 83 NY2d 531 [1994]; *Matter of Jamaal C.*, 19 AD3d 144 [1st Dept 2005].) Here, Miller alone and on foot, with no display or force, asked the defendant to stop the car to provide contact information for a later interview. He made it clear that he would honor the defendant's statement that the defendant did not want to answer questions at that time and placed no restrictions on the defendant's liberty. Therefore, the request that the defendant stop his car to speak to Miller did not constitute a seizure.

Once the defendant voluntarily stopped his car, Miller did not direct the defendant to step out of the car or to remain at the scene, or in any way restrict the defendant's freedom of movement. Rather, once the defendant's identity was confirmed and

the contact information obtained, Miller walked away from the defendant, making no indication that the defendant was required to remain at the scene or to do anything further. Therefore, as there was no seizure of the defendant's person, the latter statements are not the fruit of an illegal stop or seizure and may not be suppressed on that basis.

In any event, even if this request to stop the car were to be construed as a seizure of the defendant, the seizure ended when Miller walked away, leaving the defendant free to decide where he wished to be and whom he wished to talk to. The latter statements were made at different times and different locations and the defendant's liberty was not constrained by Miller or by any law enforcement official during the interim. Thus, even if the initial stop constituted an illegal seizure, which this court does not find, the latter statements were not the product of that seizure and are not subject to suppression as illegal fruit.

■ Second, the defendant claims that the statements were not voluntary because he was not administered *Miranda* warnings before any of the statements. Because the defendant remained at liberty throughout the afternoon and evening of March 12, 2008, and was never in custody, there was no need for *Miranda* warnings to be issued at any of the brief interviews by Miller or Lynch. (*See People v Paulman*, 5 NY3d 122 [2005]; *People v Centano*, 76 NY2d 837 [1990].) Similarly, the defendant was not in custody the next day, when Miller and his partner spoke to the defendant on audiotape in the defendant's garage. The defendant's liberty was not constrained in any way during this interview and he remained free to choose to do anything he wished, a fact made clear by the interruption of the interview for the defendant to answer a telephone call. Therefore, *Miranda* warnings were not required for the audiotaped statement.

■ Finally, the defendant asserts that his audiotaped statement was taken in violation of his right to counsel because he requested counsel during the interview. A request for counsel made during a non-custodial interview, such as this one, must be scrupulously honored by law enforcement. (*See People v Rowell*, 59 NY2d 727 [1983].) However, to be effective, the request for counsel must be *unequivocal*. (*See People v Glover*, 87 NY2d 838, 839 [1995]; *People v Hicks*, 69 NY2d 969, 970 [1987]; *People v Hart*, 191 AD2d 991 [4th Dept 1993].) Whether a request for counsel is or is not unequivocal must be determined based on the circumstances under which it is made, including the

defendant's demeanor, manner of expression and the words used. (*See Glover*, 87 NY2d at 839.) To unequivocally request counsel, the request must be clear that the desire is to speak with counsel before speaking with the authorities. It is not sufficient to suggest that one might like to speak to counsel (*People v Fridman*, 71 NY2d 845 [1988]), that one maybe needs an attorney (*People v Davis*, 193 AD2d 1142 [4th Dept 1993]), or that one should have counsel. (*People v Hart*, 191 AD2d at 991.) Moreover, in a non-custodial interview, a defendant may revoke an earlier request for counsel without the requirement that counsel be present for the revocation. (*See Glover*, 87 NY2d at 839; *People v Davis*, 75 NY2d 517, 522-523 [1990]; *People v Casey*, 37 AD3d 1113, 1115-1116 [4th Dept 2007].) Such revocation may be accomplished by actions as well as words. (*See e.g. People v Oxley*, 64 AD3d 1078, 1080 [3d Dept 2009] [request for counsel repudiated where defendant continued speaking to the officers conducting a search warrant in the same manner as he had before jokingly calling out the window to a friend that he "need(ed) a lawyer in here"].)

During the audiotaped interview, the defendant once mentioned that he thought that he needed to discuss a particular issue with counsel. When Miller attempted to clarify this statement, the defendant cut him off and continued to answer the original question, as though he had never suggested that he might wish to speak with counsel. He did not ask to stop the interview or mention the issue of counsel again during the interview. On these facts, the defendant did not make an unequivocal request for counsel. At best, the record demonstrates that the defendant's reference to counsel was not the statement of a desire to speak to counsel before speaking to Miller, but the expression that he might need to consult with counsel in the future regarding his agreement with Babou. Moreover, if the defendant's statement could have been construed as an unequivocal request for counsel, that request was subsequently revoked by the defendant's conduct in cutting off any inquiry into his statement and continuing his answer as though no reference to counsel had been made. Therefore, the audiotaped statement was not taken in violation of the defendant's constitutional right to counsel.

In sum, the People have met their burden of proving that all of the defendant's statements made on March 12 and 13, 2008 were freely and voluntarily given under circumstances free of coercion. (*See e.g. People v Williams*, 222 AD2d 468, 468 [2d

Dept 1995]; *People v Hayes*, 221 AD2d 468, 468 [2d Dept 1995].) Therefore, the motion to suppress each of the statements is denied.

The Physical Evidence

The physical evidence was obtained either pursuant to the search warrant, which the defendant has not controverted, or by the defendant's consent. The defendant gave oral consent on the audiotape for the concrete form taken on March 13, 2008 from the garage and gave both oral and written consent for the spiral notebook and the computer tower, taken on April 4, 2008. The hearing evidence establishes that the defendant was cooperating with the investigation and that he gave his consent freely and voluntarily. He was neither threatened nor coerced into giving his consent. Therefore, the physical evidence was legally obtained and may be introduced into evidence at trial. (*See People v Gonzalez*, 39 NY2d 122 [1976]; *People v Jean*, 13 AD3d 466 [2d Dept 2004]; *People v Richardson*, 229 AD2d 316 [1st Dept 1996].)

Conclusion

Therefore, and for the foregoing reasons, defendant's motion to suppress evidence is denied in all respects.