THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JASON EDMUND, Appellant.

Fourth Department, July 12, 1991

196

APPEARANCES OF COUNSEL

*John Gannon* for appellant.

*Peter L. Broderick, District Attorney (Thomas Brandt* of counsel), for respondent.

## OPINION OF THE COURT

BALIO, J.

Defendant was convicted of criminal possession of a

controlled substance in the first degree, a class A-I felony. There is no merit to defendant's contentions that the prosecution failed to corroborate the testimony of an accomplice or that imposition of the minimum indeterminate term of imprisonment mandated by statute was harsh and excessive. Further discussion of these issues is unnecessary. Defendant also contends that the suppression court erred in refusing to suppress physical evidence (cocaine) seized by law enforcement personnel and statements made by defendant subsequent to an encounter that originated on a sidewalk in the City of Niagara Falls. We conclude that the court properly denied defendant's motion to suppress, and thus we affirm.

## I

The Niagara County Drug Task Force had general information that drug couriers were using trains to transport cocaine from New York City to the Niagara Falls area. On April 28, 1989, three members of the Task Force positioned themselves at the Amtrak train station in Niagara Falls to observe passengers exiting a train arriving from New York City at 10:45 P.M. Peter Pesaresi, a United States Senior Border Patrol Agent with several years of experience in the investigation and detection of drug trafficking, first observed the defendant standing in the doorway of a train car with a young woman slightly behind or to defendant's side. Defendant appeared "concerned" or "nervous" as he looked around the platform area before detraining. He then walked from the station platform at a rapid pace with his female companion a step or two behind. Defendant did not wait at the station to be met by anyone, did not stop to talk with anyone and walked past waiting taxi cabs. He and his companion had no suitcase or checked baggage; each was carrying a small overnight bag. Agent Pesaresi determined that defendant's conduct and appearance satisfied several characteristics of the drug courier profile—a young person arriving from New York City, a source city, traveling alone or with another young person without checked baggage, leaving the station without meeting anyone, presenting a flattop haircut or high flattop and dressed in "modish" clothes. Pesaresi also thought defendant might be an alien, but he did not articulate any basis for that impression. Pesaresi conversed with the other members of the Task Force and, based upon his training and experience, determined that defendant satisfied enough of the profile characteristics to warrant inquiry. The three Task Force

members entered their vehicle and drove along Lockport Street. They located defendant and his companion walking side-by-side along Lockport Street about a block and a half from the station, pulled their vehicle into a parking lot and exited the vehicle. Only Pesaresi approached defendant and his companion. He identified himself as a Border Patrol Agent and asked defendant about his citizenship. When defendant responded that he was from Trinidad, Agent Pesaresi asked him for documentation. Defendant had no "green card", the alien registration card he was required to have on his person at all times, or other form of identification, but indicated that he had a letter from the Immigration Service at his home. Agent Pesaresi then asked defendant's companion about her citizenship. She indicated that she was a United States citizen, but she also possessed no identification. Agent Pesaresi then asked defendant and his companion if they would accompany him to the Border Patrol station so Pesaresi could check on defendant's citizenship. They agreed to do so, and without being handcuffed, were transported to the Border Patrol station. Agent Pesaresi testified at the suppression hearing that, if they had refused to accompany him to the station, he would have let them go.

Upon arrival at the station, Pesaresi asked defendant if he had any identification in his overnight bag. When defendant replied that he did not, Pesaresi asked if defendant would mind if Pesaresi looked through his bag. Defendant told him to go ahead and look, but the inspection revealed only personal effects and an address book. Pesaresi also asked defendant if the young woman was traveling with him, and defendant indicated that he had just met her on the train. Agent Pesaresi then asked her if he could look for identification in her bag, and she told him to go ahead. Inspection of the companion's bag uncovered three packages of cocaine wrapped with duct tape. The companion denied ownership of the cocaine and told Pesaresi that she had met the defendant in New York City and had known him for some time. Defendant and his companion were arrested and transported to the City of Niagara Falls police station.

The suppression court granted defendant's motion to suppress statements made by defendant at the police station regarding prior criminal activity. The court further determined that defendant had no standing to challenge seizure of the cocaine from his companion's overnight bag, and that portion of the court's decision is not questioned on appeal.

Defendant does take issue with the court's refusal to suppress his address book or statements made by defendant regarding his relationship with the companion.

## II

■ Defendant contends that the initial encounter with defendant and his companion on the public sidewalk constituted a "stop", and that, because law enforcement officials lacked reasonable suspicion that defendant or his companion had committed, or was about to commit, a crime *(see,* CPL 140.50 [1]; *Terry v Ohio,* 392 US 1), the products of that unlawful detention (the address book and statements) should have been suppressed. The suppression court held that the initial encounter did not constitute a detention; that Agent Pesaresi did not restrict defendant's freedom of movement; that no weapons or any other restraint were displayed by law enforcement officials; and that Agent Pesaresi "simply asked a question of a person he intentionally encountered on the street". We agree that the initial encounter did not constitute a stop, and thus, that reasonable suspicion was not required as a basis for the intrusion.

Every encounter between a law enforcement official and a person does not amount to a "stop", a detention of the person so significant as to constitute a seizure in the constitutional sense *(see, Florida v Bostick,* 501 US —, 111 S Ct 2382 [June 20, 1991]; *Terry v Ohio,* 392 US 1, 19, n 16, *supra).* "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" *(Terry v Ohio, supra,* at 19, n 16; *see also, Florida v Bostick, supra; Immigration & Naturalization Serv. v Delgado,* 466 US 210, 215). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions" *(Florida v Royer,* 460 US 491, 497). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification" *(supra,* at 497). "[M]ere police questioning does not constitute a seizure" *(Florida v Bostick, supra,* 501 US, at —, 111 S Ct, at 2386). "Unless the circumstances of the encounter

are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment" *(Immigration & Naturalization Serv. v Delgado, supra,* at 216). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" *(United States v Mendenhall,* 446 US 544, 554 [Stewart, J.]; *see also,* 3 LaFave, Search and Seizure § 9.2 [h] [2d ed]; Clancy, *The Supreme Court's Search for a Definition of a Seizure: What is a "Seizure" of a Person Within the Meaning of the Fourth Amendment?,* 27 Am Crim L Rev 619 [1990]).

The instant record is devoid of evidence that the initial encounter constituted a *Terry* stop. No weapon was displayed, and there was no physical touching. Only one officer approached defendant and his companion, and the initial conversation was limited to questions regarding citizenship and a request for identification. The suppression court properly concluded that defendant was not unlawfully detained or subjected to a *Terry* stop *(see, People v De Bour,* 40 NY2d 210; *see also, Florida v Bostick,* 501 US —, 111 S Ct 2382, *supra; United States v Hooper,* 935 F2d 484).

## III

Although police encounters less intrusive than a *Terry* stop do not, under Federal judicial authority, violate the Fourth Amendment, the New York Court of Appeals has recognized that two types of police encounters less intrusive than *Terry* stops—the police officer's common-law right of inquiry and the minimal intrusion of approaching to request information—may impermissibly violate a person's right to be free from official interference and that these lesser intrusions are subject to constitutional scrutiny *(People v De Bour* and *People v La Pene,* 40 NY2d 210). Because of their less intrusive nature, the court has held that a lesser quantum of knowledge is required for each intrusion which, in its view, "directly correlates the degree of objectively credible belief with the permissible scope of interference" *(People v La Pene, supra,* at 223).

■ While there is no "bright line" that separates an approach for information from the common-law right of inquiry, we agree with the suppression court that Agent Pesaresi exercised the minimal intrusion of an approach for information. Pesaresi's brief conversation regarding citizenship and identification is distinguishable from the conduct of law enforcement personnel who approach a defendant to gain some explanation for his actions, the latter conduct being illustrative of the common-law right to inquire *(see, e.g., People v Carrasquillo,* 54 NY2d 248, where police, though unaware that particular crime had been committed, sought explanation from defendant regarding contents of a bag).

We agree with defendant that the members of the Drug Task Force lacked a founded suspicion that criminal activity was afoot prior to Agent Pesaresi's approach. However, because this was a mere approach for information, the issue is whether members of the Task Force possessed "some objective credible reason for that interference not necessarily indicative of criminality" *(People v La Pene,* 40 NY2d 210, 223, *supra).* Behavior or circumstances completely consistent with innocent activity may constitute an objective credible reason for an approach for information *(see, People v De Bour,* 40 NY2d 210, 220, *supra; People v Heston,* 152 AD2d 999, *lv denied* 76 NY2d 858, 940). Further, behavior or circumstances that satisfy several characteristics of a drug courier profile may also constitute an objective credible reason for such an approach *(see, United States v Sokolow,* 490 US 1, where profile characteristics were sufficient to constitute reasonable suspicion; *United States v Hooper,* 935 F2d 484, *supra; United States v Lee,* 916 F2d 814). In the subject case, law enforcement personnel had general information that trains were being used to transport cocaine from New York City to Niagara Falls. Defendant was observed leaving a train that had departed from New York City and arrived at Niagara Falls. Neither defendant nor his companion carried a suitcase or checked baggage, and defendant's hairstyle and manner of dress was consistent with courier profile characteristics. Defendant and his companion each carried only a small overnight bag. Defendant looked apprehensively about the platform area before stepping from the train and walked rapidly from the station. These circumstances, as viewed by a law enforcement official experienced in the investigation of drug trafficking, constituted an objective credible reason for approaching defendant and his companion.

■ The instant matter also is distinguishable from our recent decision in *People v Branch* (— AD2d — [June 7, 1991]). In *Branch,* we upheld the suppression of evidence seized from the defendants following an encounter inside a bus terminal. We agreed with the court's findings that the initial detention was lengthy, more intimidating than a mere request for information, and that law enforcement personnel lacked articulable facts indicative of criminal activity. We also agreed with the suppression court's finding that law enforcement officials had no reasonable suspicion to support the more intrusive removal of Branch and his codefendant to the bus terminal office *(see, Florida v Royer,* 460 US 491, *supra).* In the instant case, the brief initial intrusion amounted to a mere request for information, and prior to removing defendant for the more intrusive detention at the Border Patrol station, Agent Pesaresi had a reasonable suspicion that defendant had committed a crime—the failure to have an alien registration card (his "green card") in his possession *(see,* 8 USC § 1304 [e]).

In sum, law enforcement personnel possessed an objective credible reason to approach defendant and his companion to request information, and the subsequent detention of defendant and search of his overnight bag was lawful.

DENMAN, J. P., BOOMER, LAWTON and DAVIS, JJ., concur.

Judgment unanimously affirmed.