OPINION OF THE COURT
John L. DeMarco, J.
Defendant is charged by indictment No. 2012-0944 with one count of criminal possession of a weapon in the second degree, in violation of Penal Law § 265.03 (3), in connection with an incident occurring in the City of Rochester, County of Monroe, on November 28, 2012. The defendant brought a motion to suppress tangible and statement evidence. The tangible evidence at issue is a .45 caliber pistol. The People filed opposition papers. The court conducted a hearing on these issues on July 2, 2013. At the conclusion of the hearing, the court placed its findings of fact on the record, and reserved decision. The court fully adopts and incorporates its findings of fact herein, and credits the testimony of the People’s witnesses at the hearing. The parties have filed written memoranda in support of their respective positions. The court has reviewed the evidence presented at the hearing, including the admitted exhibits, as well as the parties’ written memoranda.
Defendant contends that the police had no legal justification to pursue, detain or question him on November 28, 2012. More *830 specifically, defendant argues that at the time he was observed by police, neither he nor any of the three individuals he was with had committed any observable violation(s) of law, nor were they engaged in any suspicious activity that properly gave rise to reasonable cause to believe that criminality was afoot. Defendant contends that law enforcement had no justification to pursue him when he ran and that, accordingly, the tangible and statement evidence at issue should be suppressed as fruits of an unlawful seizure and arrest. Defendant also contends that his alleged admissions to law enforcement pursuant to his seizure and arrest (if deemed lawful) were the fruit of an unlawful arrest and made in violation of his Miranda rights. The People respond that defendant’s action of “blading” his body—i.e., quickly turning and walking in a side-stepping manner as the police cars approached his vicinity—and then, without provocation, suddenly running and discarding a dark object from his waistband, justified the police pursuit. The People argue that defendant’s seizure and arrest were warranted, and that defendant’s statements pursuant to his arrest were voluntarily made and not in violation of his Miranda rights. The People further contend that defendant abandoned the tangible evidence at issue, and that said abandonment was not precipitated by police illegality.
The court finds that defendant’s seizure and arrest were lawful and that, in any event, defendant abandoned the tangible evidence at issue, and that said abandonment was an independent act not precipitated by police illegality. The court also finds that defendant’s alleged statements to Rochester Police Department Officer Jeffrey McEntee were made in violation of his Miranda rights. Defendant’s alleged statements to Rochester Police Department Investigator Timothy Gourlay were not. The court’s conclusions of law follow.
A. Conclusions of Law
As the Court of Appeals has repeatedly explained, the “purpose in [People v] De Bour [(40 NY2d 210 [1976])] was to provide clear guidance for police officers seeking to act lawfully in what may be fast-moving street encounters and a cohesive framework for courts reviewing the propriety of police conduct in [those] situations” (People v Moore, 6 NY3d 496, 499 [2006] [emphasis added]; see De Bour, 40 NY2d at 223). In De Bour (40 NY2d at 223), for example, the Court of Appeals held that the least intrusive level of inquiry is a request for information when *831 there is some objective, non-arbitrary reason for that interference. This connotes that the Court of Appeals’ notion of what constitutes a street encounter, in the first instance, requires some level of interference. Moreover, and consistent with this notion, The American Heritage Dictionary defines the term “encounter” as “an unplanned or unexpected meeting” or “a hostile confrontation” (The American Heritage Dictionary 451 [2d ed 1991]). Dictionary.com defines “encounter” as “to come upon or meet with” or “to meet with or contend against” (Dictionary.com, http://dictionary.reference.com/browse/ encounter?s=t/ [accessed Aug. 29, 2013]). Here, in contrast to the above notions, there was neither an interference nor an encounter.
Thus, the critical question is not, as defendant would have it, whether his act of flight, alone, or even in conjunction with all the surrounding circumstances, provided police reasonable suspicion to pursue him (cf. People v Holmes, 81 NY2d 1056, 1058 [1993]; People v Martinez, 80 NY2d 444, 446 [1992]; People v Sierra, 83 NY2d 928, 929 [1994]; People v Cady, 103 AD3d 1155, 1156 [4th Dept 2013]; People v Riddick, 70 AD3d 1421, 1422 [4th Dept 2010], lv denied 14 NY3d 844 [2010]); these concepts are not determinative here (see People v Edmund, 169 AD2d 195, 199 [4th Dept 1991], lv denied 78 NY2d 1075 [1991] [where the initial encounter does not constitute a “stop,” reasonable suspicion is not required]). Rather, the relevant question to be resolved, as the facts here fall short of illustrating even the lowest level of intrusion contemplated in De Bour, much less a “stop,” is whether defendant abandoned the tangible evidence at issue, or whether it was revealed as a direct result of police illegality and constitutes fruit of the poisonous tree (see People v Ramirez-Portoreal, 88 NY2d 99, 110 [1996]; see also Wong Sun v United States, 371 US 471 [1963]; People v Cantor, 36 NY2d 106, 114 [1975]).
The court notes at the outset that as defendant may rely on the People’s proof to establish standing (see CPL 710.60 [1]; People v Burton, 6 NY3d 584, 588-589 [2006]), and as his suppression claims are grounded in essentially the same facts involving at least one of the same police witnesses, considerations of judicial economy militated in favor of conducting the hearing, notwithstanding any pleading deficiencies in defendant’s papers (see People v Mendoza, 82 NY2d 415, 429-430 [1993]; People v Otero, 51 AD3d 553, 554 [1st Dept 2008]).
Indispensable to the analysis here is the fact that defendant’s flight was not provoked by unlawful police conduct or, for that *832 matter, any discernable interaction at all with the police. The record bears out that defendant fled as police merely entered his vicinity in two separate patrol cars. Neither patrol car activated its emergency lights or sirens in approaching defendant’s vicinity. Nor did either patrol car approach defendant’s vicinity in a rapid or otherwise exigent manner. In addition, neither patrol car impeded defendant’s line of travel or freedom of movement. Nor did any police officer in either patrol car make any gestures or explicitly assert anything to defendant or his companions, much less any commands, before defendant fled. Indeed, both police cars were patrolling defendant’s vicinity as part of their detail, with no suspicion at all regarding criminality in the area or as to defendant and his companions.
Dispositive of the analysis, in addition to and in view of the above-stated circumstances, is the uncontroverted fact that defendant fled before Officer McEntee or Officer Pitts exited their patrol vehicles. It is further uncontroverted that Officer Pitts observed defendant “blade” his body, run and then toss a dark object, all within seconds, while still seated in her patrol vehicle (tr at 79, lines 5-8). Doubtless, this observation, made from a vantage point where Officer Pitts had a legal right to be (inside her police vehicle on a public roadway), coupled with defendant’s flight, afforded her adequate justification to exit her vehicle to investigate what defendant tossed or to pursue him (see Cady, 103 AD3d at 1156). In any event, defendant’s act of tossing the dark object was an independent act not precipitated by improper police conduct, and reasonably begets the exclusive inference that he consciously intended to relinquish it, and, in so doing, surrendered any privacy interest in it (see generally Ramirez-Portoreal, 88 NY2d 99; see also People v Howard, 50 NY2d 583, 593 [1980], cert denied 449 US 1023 [1980]; People v Boodle, 47 NY2d 398, 404 [1979], cert denied 444 US 969 [1979]). Notably, defendant may not even have been aware when he tossed the dark object that Officers McEntee and Pitts actually exited their patrol vehicles.
With respect to defendant’s seizure, even assuming arguendo that Officer McEntee’s pursuit of defendant was unlawful, the seizure was nevertheless lawful. The record reflects that Officer Pitts, during her pursuit of defendant, called out (yelled) when she observed defendant go over a fence, and Officer McEntee then seized him (tr at 79, lines 9-15). The record further reflects that Officer Pitts was involved with handcuffing defendant before she backtracked and recovered the gun (tr at *833 104, lines 2-4). Officer Pitts’ collective observations of defendant justified the temporary seizure to investigate what, if anything, defendant may have tossed moments after she observed his flight. This is not a case of an improper seizure leading to the recovery of tangible evidence, where the evidence may not have been recovered but for the improper seizure or resulting incriminating statements. The seizure of defendant by Officers Pitts and McEntee was reasonably related in scope to the aggregate circumstances leading up to that encounter (see People v William II, 98 NY2d 93, 98 [2002]), notwithstanding that defendant’s flight, in the first instance, was not precipitated by any encounter whatsoever with the police.
Furthermore, the seizure is not rendered improper merely because it involved Officer McEntee, who, arguably, was without sufficient indicia of criminality to justify his pursuit of defendant in the first place. Notably, the temporary seizure of defendant did not occur until after Officer Pitts’ observations and yelling out to Officer McEntee that defendant was headed in his direction. To maintain that it was illegal for Officer McEntee at that juncture to tackle and seize defendant, based merely on the questionability of his initial pursuit, would yield an absurd result. Clearly, Officer McEntee may react to information imparted by a fellow officer, especially one with whom he is interacting in real time as part of the same detail. To hold otherwise would unfairly strain law enforcement’s ability to work together and exchange critical information under rapidly developing circumstances where such real time communications—oftentimes made under the most stressful of circumstances which, by their very nature, are inconducive to poised reflection—may mark the difference between apprehension of the suspect versus failure to apprehend, or life and death.
Because there was no street encounter here, and because defendant’s flight was not provoked by police illegality, the tangible evidence that he discarded while in flight was abandoned and, in this court’s view, not so as a result of any infringement of defendant’s Fourth Amendment rights. The cases cited by defendant are inapposite, as the instant facts fall short of a street encounter, triggering analysis under the well settled legal principles set forth in De Bour (40 NY2d 210 [1976]) and its progeny. Defendant does not address the issue of abandonment in his papers. Defendant’s motion to suppress tangible evidence is denied.
Defendant also contends that the statements he made to police were involuntarily made within the meaning of CPL 60.45, *834 or otherwise inadmissible as unlawfully or unconstitutionally obtained.
The court begins this part of its analysis by noting that a confession or admission is admissible at trial only if its voluntariness is established beyond a reasonable doubt (see People v Yarter, 41 NY2d 830 [1977], cert denied 433 US 910 [1977]; People v Valerius, 31 NY2d 51 [1972]). Miranda warnings are required when a person is subjected to custodial interrogation (see Miranda v Arizona, 384 US 436 [1966]; People v Berg, 92 NY2d 701 [1999]). Whether a suspect is in custody is generally a question of fact (see People v Centano, 76 NY2d 837 [1990]), and the standard to be applied is whether a reasonable person, innocent of any crime, would have believed he was not free to leave (see People v Yukl, 25 NY2d 585 [1969]).
The court declines to suppress defendant’s statements to Officer McEntee that he (defendant) just found the gun and that the gun was not his as the fruit of an unlawful arrest, for the reasons explained above. The court does find, however, that said statements were made in violation of defendant’s Miranda rights. Defendant made said statements while in handcuffs and seated inside a police car with the door open and Officer McEntee standing in between the door and the defendant. Defendant was no doubt in custody at that time, and Officer McEntee did not read defendant his Miranda rights. Because the above statements were made in response to questions Officer McEntee knew or should have known were likely to elicit an incriminating response (see Rhode Island v Innis, 446 US 291, 302 [1980]), and were not pedigree in nature (see People v Alleyne, 34 AD3d 367, 368 [1st Dept 2006], lv denied 8 NY3d 918 [2007], cert denied 552 US 878 [2007] [holding that “a question which falls within the scope of interrogation . . . does not for that reason fall outside the pedigree exception” (citation and internal quotation marks omitted)]), they are inadmissible at trial.
On the other hand, the court concludes that the custodial interrogation of defendant which yielded his written statement to Investigator Gourlay was in all respects proper and lawful. Investigator Gourlay preceded his questioning by an adequate advisement of the Miranda rights, after which defendant knowingly, intelligently and voluntarily waived his rights and agreed to be interviewed. At no time did Investigator Gourlay promise defendant anything to get him to talk, or threaten him in any way. Nor did Investigator Gourlay offer or deny defendant *835 anything to get him to talk. Investigator Gourlay asked defendant if he could read and write English, to which defendant responded he could. Investigator Gourlay testified that defendant did not appear to be under the influence of alcohol or narcotics, based on his experience interacting with people under the influence of those substances. Investigator Gourlay testified that defendant was coherent and did not at all appear lethargic. While Investigator Gourlay drafted defendant’s statement, defendant reviewed the statement for accuracy and was given the opportunity to make any changes or additions to it. Investigator Gourlay .placed defendant’s two-page statement in front of him and asked defendant to read the first sentence aloud to insure that defendant could understand his (Investigator Gourlay’s) writing and sufficiently read English. Defendant read the first sentence with no problem, and Investigator Gourlay stood next to him and read the entire statement aloud. Investigator Gourlay then asked defendant if he wanted to make any changes or add anything, and defendant did not make any changes.'
Significantly, before signing and initializing his (defendant’s) approval of the statement, defendant stated to Investigator Gourlay that he felt sick. As Investigator Gourlay escorted defendant to the bathroom, he (defendant) vomited on the floor in the hallway. Defendant did not request medical attention before or after vomiting. After defendant vomited, he proceeded to the restroom, washed his hands, and Investigator Gourlay then escorted him back to the interview room. Investigator Gourlay asked defendant if he was okay, to which defendant responded, yes. Investigator Gourlay asked defendant if he needed to go back to the hospital, to which defendant responded, no. Investigator Gourlay again asked defendant if he was medically okay, to which defendant responded that he was sore but okay and did not want to go back to the hospital. Investigator Gourlay reread defendant’s statement to him, while defendant was seated with the statement in front of him. Investigator Gourlay again gave defendant an opportunity to change or add anything before signing the statement. Defendant made one cross-out on page one, signed the bottom of page two, and drew a horizontal line on the empty portion on page two that was not written on and initialed at the beginning and end of the line so nothing could be added without his consent. Defendant never asked for the interrogation to stop, or for the assistance of counsel. The People established the voluntariness of defendant’s written statement to Investigator Gourlay beyond a reasonable doubt.
*836 The court further finds that despite the aforesaid Miranda violation, there was a sufficient break in the chain of events to allow for the admission of defendant’s written statement. The fact that defendant’s written statement was made following a valid Miranda waiver at a significantly different time and location and to a different officer indicates a change in the nature of the interrogation to constitute a “sufficiently definite, pronounced break in the interrogation to dissipate the taint from the [earlier] Miranda violation” (see People v Braswell, 49 AD3d 1190, 1191 [4th Dept 2008], lv denied 10 NY3d 860 [2008] [citations and internal quotation marks omitted]; see also People v Smith, 275 AD2d 951 [4th Dept 2000], lv denied 96 NY2d 739 [2001]; People v White, 10 NY3d 286 [2008]). Defendant’s reliance on People v Chapple (38 NY2d 112 [1975]) and People v Bethea (67 NY2d 364 [1986]) contending that his written statement should be suppressed because it was part of one continuous chain of events is misplaced. In both Chappie and Bethea, defendants were subjected to extensive, un-Mirandized custodial interrogations (see White, 10 NY3d at 291-292; People v Bolus, 185 AD2d 1007, 1008 [3d Dept 1992], lv denied 81 NY2d 785 [1993]). That was not the case here. Defendant’s initial statements to Officer McEntee were obtained from defendant while he was seated in a patrol car at the crime scene at approximately 8:22 p.m. Defendant was later informed of his Miranda rights by another officer (Investigator Gourlay) at the station at approximately 9:52 p.m. After defendant waived those rights— approximately one and one half hours after his initial unMirandized statements—Investigator Gourlay elicited defendant’s written confession. Under the circumstances, the “earlier unwarned statement cannot be said to have committed [defendant] to later confessing to the crime” (Smith, 275 AD2d at 952 [citations and internal quotation marks omitted]). Defendant’s written statement is therefore admissible at trial.
B. Conclusion
Based upon the foregoing, defendant’s motion to suppress tangible evidence is denied. Defendant’s motion to suppress statement evidence is granted in part and denied in part.